**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Kirkland*, Slip Opinion No. 2020-Ohio-4079.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-4079

THE STATE OF OHIO, APPELLEE, *v*. KIRKLAND, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Kirkland*, Slip Opinion No. 2020-Ohio-4079.]**

*Criminal law—Aggravated murders—Death sentences imposed after resentencing hearing affirmed.*

No. 2018-1265—Submitted March 10, 2020—Decided August 18, 2020.

APPEAL from the Court of Common Pleas of Hamilton County, No. B 0901629.

_____

FRENCH, J.

{¶ 1} Between 2006 and 2009, appellant, Anthony Kirkland, murdered two teenaged girls, Casonya C. and Esme K., and two adult women, Mary Jo Newton and Kimya Rolison. Kirkland pleaded guilty to the murders of Newton and Rolison and was sentenced to 70 years to life. A jury found Kirkland guilty of the aggravated murders of Casonya and Esme, and he was sentenced to death for each aggravated murder.

{¶ 2} This court initially affirmed Kirkland's convictions and sentence. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818 ("*Kirkland*

*I*"). However, upon Kirkland's subsequent motion for relief, we vacated the death sentences and remanded this case to the trial court for resentencing, in accordance with R.C. 2929.06(B), on the aggravated-murder convictions. 145 Ohio St.3d 1455, 2016-Ohio-2807, 49 N.E.3d 318 ("*Kirkland II*"). On remand, the jury recommended a death sentence for each murder and the trial court again sentenced Kirkland to death for the aggravated murders of Casonya and Esme.

{¶ 3} This is an appeal of right from those two death sentences. Kirkland presents 11 propositions of law. For the reasons we explain below, we affirm the judgment of the trial court.

## I. FACTS

### A. The Murders

#### 1. Casonya C.

{¶ 4} Fourteen-year-old Casonya C. lived in Cincinnati with her grandmother, Patricia C. On May 3, 2006, around 11:00 p.m., Patricia learned that Casonya had left the house. The next day, Casonya was absent from school, and Patricia learned that Casonya's mother had not seen her. Patricia called the police and reported Casonya missing.

{¶ 5} On May 9, 2006, city workers called police after finding a body underneath a pile of old tires in a secluded area near the end of a dead-end road. The body was heavily charred and decomposed. Some teeth had been recently knocked out.

{¶ 6} Just past the end of the road, police found a charred area where it appeared that the body had been burned before being moved and covered with tires. Nearby they found a piece of timber that was charred at one end; it had apparently been used to stir the fire. The victim was later identified as Casonya C.

#### 2. Mary Jo Newton

{¶ 7} On June 15, 2006, smoldering human remains were found near the end of a dead-end street, about half a mile from where Casonya's body had been

found. An autopsy indicated that the victim was already dead when the body was set on fire. The victim was identified as Mary Jo Newton.

{¶ 8} Cincinnati homicide detective Keith Witherell interviewed Kirkland in March 2007 in connection with the homicides of Newton and Casonya. Kirkland admitted having had sex with Newton, but denied ever harming her. When he was shown a photograph of Casonya, he said he did not recognize her. Having no evidence to link Kirkland with these murders, police did not then arrest or charge him.

### 3. Kimya Rolison

{¶ 9} On June 13, 2008, the scattered bones of a third victim were found in a wooded area at the dead end of Pulte Street in Cincinnati. No specific cause of death could be determined. However, there was a cut on one of the cervical (neck) vertebrae that the coroner's office determined had been caused by a sharp instrument, such as a knife, being applied with significant force. The bones had been burned. In 2009, the remains were identified as those of Kimya Rolison, who had been missing since October 2006.

### 4. Esme K.

{¶ 10} On the afternoon of March 7, 2009, 13-year-old Esme K. went jogging around a reservoir near her home. She was wearing a purple wristwatch and carrying her iPod.

{¶ 11} Later that day, Esme's mother called 9-1-1 to report that Esme was missing. Responding to the call, police searched an abandoned house and a wooded area near the reservoir. Two officers spotted Kirkland sitting under a tree. They saw knives protruding from his pocket, so they disarmed and searched him. In his pockets they found a purple watch and an iPod with Esme's name on it. Esme's mother identified these items as Esme's.

{¶ 12} Kirkland initially gave a false name and claimed he had found the watch and iPod. After police efforts to confirm his identity failed, Kirkland gave

his real name. As the search for Esme continued, police took Kirkland to the station.

{¶ 13} Searchers found Esme's body in the woods. Her body was nude except for socks and shoes and was seated, with her back up against a fallen tree branch, legs apart. Her genitals, inner thighs, and left hand had been severely burned.

{¶ 14} An autopsy indicated that Esme had been killed by ligature strangulation. The large number of petechiae (ruptured blood vessels) on her face was consistent with a long struggle, possibly eight to ten minutes. Hemorrhaging underneath her scalp showed that she had been struck on the back of the head.

{¶ 15} There was also evidence of premortem trauma to Esme's vagina and anus, possibly caused by an attempt to penetrate those areas with a penis or foreign object. DNA consistent with Esme's was found on Kirkland's hands, penis, and underwear.

### B. Kirkland's Interrogation

{¶ 16} Detective Witherell interviewed Kirkland on March 8, 2009. During this interview, Kirkland told multiple inconsistent stories.

{¶ 17} At first, he claimed to have no idea his arrest was related to the missing girl. Kirkland said that while walking in the woods around the reservoir on the morning of March 7, he found a purple watch and a "pink radio" (Esme's iPod), which he pocketed. He repeatedly denied having seen anyone jogging near the reservoir, pretended he did not even know the missing girl's race, and professed surprise when he was told that the watch and "radio" belonged to the missing girl.

{¶ 18} After further questioning, Kirkland admitted that he had met Esme at the reservoir. He claimed that he and Esme collided, causing him to drop his beer and lose his temper. He admitted that he had punched and kicked Esme, but claimed he had left her alive.

{¶ 19} After detectives told Kirkland that Esme's body had been found, he changed his story again, claiming to have no memory of what had happened. He then admitted that he had chased Esme into the woods. But he continued to claim that he had left her alive.

{¶ 20} Then Kirkland changed his story again, claiming he had left Esme alive with an acquaintance he knew only as Pedro. Finally, Kirkland admitted that he had known that Esme was dead and that he had gone back to the reservoir to move her body. He said, "She died because of my hatred." Still he denied having killed her.

{¶ 21} About two hours later, Detective Bill Hilbert questioned Kirkland about Newton and Casonya C. Kirkland confessed to Newton's murder. According to Kirkland, on the day of the murder, he picked Newton up in the College Hill area. They drove around to various places, ending up in the Eden Park area, where they had an argument.

{¶ 22} According to Kirkland, during the argument, Newton struck him, and he then choked her to death. He drove to Avondale, dumped her body at the end of a dead-end street, and set her body on fire, using gasoline as an accelerant. According to Kirkland, he burned the body because "fire purifies" and burning the body was "a proper burial."

{¶ 23} Kirkland also confessed to murdering Casonya. He told Detective Hilbert that he first saw Casonya around 1:00 a.m. on a bridge near Walnut Hills High School. According to Kirkland, Casonya started a conversation with him and he paid her $20 to continue talking to him. But they had an argument, and Casonya threw the money back at him. Angry, Kirkland grabbed Casonya, and she kneed him. He then choked her to death. He carried her body to a wooded area and burned it, using lighter fluid as an accelerant. He then carried her body down a hill and covered it with tires.

{¶ 24} Kirkland then gave another account of Esme's murder. He said that he collided with Esme; she was apologetic, but he became enraged and chased her into the woods. When she tripped over a small fence, he caught her and choked her.

{¶ 25} At first, Kirkland denied having raped Esme. But he eventually told Hilbert, "[She] said that she would do whatever I wanted, just don't hurt her." He had sex with her but was unable to penetrate her completely, so he made her masturbate him. Esme said she would not tell anyone, but Kirkland did not believe her, so he choked her to death. (In a later interview, Kirkland explained that he had strangled her with a rag after failing to kill her with his bare hands.)

{¶ 26} Kirkland propped Esme's body up against a fallen tree branch and, using her clothes as an accelerant, partially burned her body. After staying with the body for a while, he went to find lighter fluid "to perform the [burning] ritual." He eventually returned to the woods but did not go back to the body; instead, he fell asleep under a tree, and that is where the police found him.

{¶ 27} In a third interview, detectives asked Kirkland about an unidentified burned body found in the Pulte Street area. At first, Kirkland claimed he had killed only three victims, but he finally admitted to having killed "one more."

{¶ 28} According to Kirkland, he knew the Pulte Street victim as Kim. She was working as a prostitute when he met her in December 2006. He picked her up in his van and paid her for sex. As they drove along, they began to argue; Kirkland pulled the van over and stabbed her in the throat with her own knife. He laid her body out on a bed of wood, sprayed it with lighter fluid, burned it, and covered it. Some of the information Kirkland provided during his confession enabled police to identify the Pulte Street remains as those of Kimya Rolison.

## C. Procedural History

{¶ 29} In 2009, the state filed a 12-count indictment against Kirkland. The indictment included four counts of aggravated murder with death-penalty

6

specifications. Count Two charged Kirkland with the aggravated murder of Casonya C. while committing or attempting to commit rape. Count Two included two death specifications: one alleging that the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more people, R.C. 2929.04(A)(5), and one alleging felony-murder predicated on rape, R.C. 2929.04(A)(7). Count Four charged Kirkland with the aggravated murder of Casonya while committing or attempting to commit aggravated robbery. Count Four included death specifications for course of conduct and felony-murder predicated on aggravated robbery.

{¶ 30} Count Nine charged Kirkland with the aggravated murder of Esme while committing or attempting to commit rape, with death specifications for murder to escape detection for rape, R.C. 2929.04(A)(3), course of conduct, and felony-murder predicated on rape. Count Eleven charged Kirkland with the aggravated murder of Esme while committing or attempting to commit aggravated robbery, with death specifications for murder to escape detection for attempted rape, course of conduct, and felony-murder predicated on aggravated robbery.

{¶ 31} The indictment also included eight noncapital counts, including one charging Kirkland with the murder of Newton. A separate indictment charged Kirkland with the murder of Rolison and abuse of her corpse. The indictments were consolidated for trial.

{¶ 32} Kirkland pleaded guilty to the murder and corpse-abuse counts relating to Newton and Rolison. The trial court sentenced him to 70 years to life for those murders. In 2010, a jury found Kirkland guilty on all remaining counts, including all the death-penalty specifications. Kirkland was sentenced to death for the aggravated murders of Casonya and Esme.

{¶ 33} In 2014, we affirmed Kirkland's convictions and death sentences. *Kirkland I*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818. However, on May 4, 2016, on Kirkland's motion, we remanded this case to the trial court for a new

mitigation-and-sentencing hearing ("resentencing hearing"), in accordance with R.C. 2929.06(B), on the aggravated-murder convictions. *Kirkland II*, 145 Ohio St.3d 1455, 2016-Ohio-2807, 49 N.E.3d 318. At the resentencing hearing, a jury again recommended death sentences on all aggravated-murder counts and the trial court sentenced Kirkland to death on each count. Kirkland now appeals those death sentences.

## II. DISCUSSION

### A. Voir Dire Issues

#### 1. Denial of Individual, Sequestered Voir Dire

{¶ 34} At the beginning of the resentencing hearing, during voir dire, 15 prospective jurors indicated either that they supported capital punishment in all cases or that they opposed it in all cases. These prospective jurors were subjected to further voir dire with respect to their views on capital punishment. Kirkland asked the trial court to conduct the death-qualification voir dire of these 15 prospective jurors individually and outside the presence of other prospective jurors. The trial court denied the request and instead death-qualified these prospective jurors in a group. In his first proposition of law, Kirkland contends that the trial court erred by denying his request for individual, sequestered voir dire.

{¶ 35} Capital defendants are not entitled to individual, sequestered voir dire. Rather, "[t]he determination of whether a voir dire in a capital case should be conducted in sequestration is a matter of discretion within the province of the trial judge." *State v. Mapes*, 19 Ohio St.3d 108, 484 N.E.2d 140 (1985), paragraph three of the syllabus; *see also State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 84.

{¶ 36} Kirkland contends that the group voir dire prejudiced him in two ways. He argues that because the first prospective juror examined was excused after stating that she would be unable to consider imposing a death sentence, "all the other prospective jurors in the room saw what they should say to get out of jury

8

duty in a capital case." Kirkland seems to suggest that subsequent prospective jurors may have lied about their beliefs "to get out of jury duty," but nothing in the record supports that conjecture. Moreover, the voir dire process gave the defense a full opportunity to test the validity of any prospective juror's claim of being biased against the death penalty.

{¶ 37} Kirkland also contends that the prosecutor made two "improper remarks" during voir dire that tainted all prospective jurors in the courtroom. We examine each in turn.

{¶ 38} First, Kirkland points to the following statement by the prosecutor: "[I]f in doing that weighing process, the aggravating circumstances have the greater weight, you shall recommend a sentence of death." The defense objected to the use of the word "recommend" and moved for a mistrial, which the trial court denied.

{¶ 39} The prosecutor's use of the word "recommend" did not violate the Constitution. *See State v. Bey*, 85 Ohio St.3d 487, 496, 709 N.E.2d 484 (1999). A jury's verdict in favor of death *is* a recommendation, since the judge may impose a life sentence even if the jury recommends death, *see* R.C. 2929.03(D)(3), and we have "consistently rejected" arguments that an accurate instruction to that effect "impermissibly reduces the jury's sense of responsibility." *State v. Carter*, 72 Ohio St.3d 545, 559, 651 N.E.2d 965 (1995); *see also State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 88.

{¶ 40} Second, Kirkland points to the prosecutor's statement that jurors would be "required to sign a death verdict" if they found that the aggravating circumstances outweighed the mitigating factors. "It is * * * only if you make such a finding, not only can you sign a death verdict, the law says to sit on this case, you have to sign a death verdict." Kirkland does not explain how this statement was improper. And in fact, it is an accurate statement. *See* R.C. 2929.03(D)(2) (if the jury unanimously finds that the aggravating circumstances outweigh the mitigating factors, it "shall recommend * * * that the sentence of death be imposed").

**{¶ 41}** Kirkland "has neither recited facts showing abuse of discretion nor demonstrated prejudice resulting from the court's refusal to conduct a sequestered voir dire," *Carter* at 555. Accordingly, we reject his claim that the trial court erred by denying his request for individual, sequestered voir dire.

## 2. Excusals for Cause

**{¶ 42}** Kirkland also contends in his first proposition of law that the trial court erroneously excused prospective jurors for cause on the ground of their reservations about capital punishment.

**{¶ 43}** It is constitutionally impermissible to exclude an impartial prospective juror for cause simply because the prospective juror expresses reservations about imposing the death penalty. *State v. Keith*, 79 Ohio St.3d 514, 519-520, 684 N.E.2d 47 (1997), citing *Witherspoon v. Illinois*, 391 U.S. 510, 520-523, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the prospective juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *see also Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *State v. Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984 (1985), paragraph three of the syllabus, *vacated on other grounds*, 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452 (1985). The trial court's finding is entitled to deference, *Witt* at 426, and will not be disturbed on appeal absent an abuse of discretion, *see, e.g.*, *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 94.

**{¶ 44}** Kirkland's brief principally discusses three prospective jurors: prospective juror Nos. 2, 8, and 27.[1] The trial court excused each of these prospective jurors for cause.

---

1. In his brief, Kirkland mistakenly refers to prospective juror No. 2 as prospective juror No. 8, and vice versa.

### a. Prospective Juror No. 2

{¶ 45} Prospective juror No. 2 stated that she could not fairly consider the imposition of a death sentence and that her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. She said: "I just can't do it"; "No, I couldn't do it"; and "I could not sentence a person to death."

{¶ 46} Defense counsel pointed out that on her questionnaire, the prospective juror had indicated that she agreed that the death penalty "should sometimes be used as punishment in certain murder cases." The prospective juror explained that she had given that response because "others have different opinions," but she did not think *she* could "do it" (i.e., impose a death sentence).

{¶ 47} She adhered to this position during most of the defense's voir dire. However, when defense counsel asked her whether "[d]espite [her] personal misgivings," she could "apply the law * * * and give reasonable, meaningful consideration to the death penalty," she said, "Perhaps."

{¶ 48} The trial judge asked the prospective juror whether she had a belief that would prevent her from signing a death verdict. She said, "Yes." In response to a defense follow-up question, she said, "Within me, I could not sign [a verdict] stating that someone should be put to death."

{¶ 49} Prospective juror No. 2's responses were consistent overall: she repeatedly proclaimed her inability to impose a death sentence. Only once did she waver even to the extent of saying, "Perhaps." The record supports a finding that this prospective juror's ability to apply the law in a capital case was at least substantially impaired. The trial court did not abuse its discretion when it excused prospective juror No. 2 for cause.

### b. Prospective Juror No. 8

{¶ 50} Prospective juror No. 8 told the judge: "I would consider your instructions but ultimately, I couldn't sign a verdict for the death penalty." Under

defense questioning, she elaborated: "I would certainly consider the Judge's instructions, and if the option of capital punishment is on the table, I would give that consideration, but I can tell you unequivocally that under no circumstances will I ever agree to put that sentence."

{¶ 51} Shortly after that, prospective juror No. 8 agreed that she "could give meaningful consideration" to the law, and she said that she "would absolutely follow the law." However, the trial judge then asked: "Bottom line is * * * you cannot put your name on a piece of paper that would seek the death penalty for any individual including this individual; is that correct?" The prospective juror replied: "That's correct, Your Honor," and the trial court then excused her.

{¶ 52} Notwithstanding her general promises to follow the law, prospective juror No. 8 stated "unequivocally that under no circumstances [would she] ever agree" to a death sentence. Her mind was made up, and the record fully supports excusing her.

### c. Prospective Juror No. 27

{¶ 53} Prospective juror No. 27 gave varying answers during voir dire. Initially, he said that he could *not* fairly consider a death sentence and that his views would prevent or substantially impair his performance as a juror. Immediately after that, though, he told the judge that although he is opposed to the death penalty, he *could* follow the court's instructions and fairly consider a death sentence. He added, "If I am selected, I have no choice but to do it" (i.e., follow the law). But he then said, "I just ask not to be in that position," because the conflict between his opposition to capital punishment and his belief in following the law would be "very difficult."

{¶ 54} Prospective juror No. 27 then reverted to his initial position: he told the court that he could not sign a death verdict and "unequivocally" could not fairly consider a death sentence. He reiterated this position during the state's voir dire.

**{¶ 55}** Prospective juror No. 27 wavered slightly under defense questioning: he said he could weigh the mitigating factors against the aggravating circumstances. But then he flipped again, stating that he could not sign a death verdict. Defense counsel asked: "You wouldn't follow the law?" The prospective juror replied: "I don't know. * * * I am back and forth."

**{¶ 56}** Kirkland contends that prospective juror No. 27 should have been retained because he did not "unequivocally say he couldn't follow the law." In fact, he did say just that. The trial court asked, "Are you stating unequivocally that under no circumstance will you follow my instructions * * * in that you cannot and will not consider fairly the imposition of the sentence of death, if appropriate in this case?" The prospective juror answered, "Yes, Your Honor."

**{¶ 57}** In any event, the test is not whether the prospective juror *unequivocally* proclaims a bias; it is whether the prospective juror's views would prevent or substantially impair the performance of his duties. *Witt*, 469 U.S. at 424, 105 S.Ct. 844, 83 L.Ed.2d 841; *see also Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984, at paragraph three of the syllabus.

What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. * * * [T]his is why deference must be paid to the trial judge who sees and hears the juror.

(Footnote omitted.) *Witt* at 424-426. Thus, a trial court does not abuse its discretion when it excuses prospective jurors who give conflicting answers on voir dire, *see*, *e.g.*, *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 135, or prospective jurors who "[do] not know how they will react when faced with imposing the death sentence," *Witt* at 426.

{¶ 58} Prospective juror No. 27 said several times that he could not consider imposing death. A few of his responses pointed the other way. Perhaps he came closest to the truth when he said: "I don't know. * * * I am back and forth."

{¶ 59} When a prospective juror gives contradictory responses, as prospective juror No. 27 did, "it is for the trial court to determine which answer reflects the juror's true state of mind." *State v. Jones*, 91 Ohio St.3d 335, 339, 744 N.E.2d 1163 (2001). The voir dire gave the trial court good grounds for concluding that prospective juror No. 27's views would prevent or substantially impair the performance of his duties. His responses amounted to "substantial testimony," *State v. Wilson*, 29 Ohio St.2d 203, 211, 280 N.E.2d 915 (1972), supporting the trial court's decision to excuse him for cause. The trial court did not abuse its discretion by excusing him.

*d. Prospective Juror Nos. 63, 66, 68, and 87*

{¶ 60} According to Kirkland, prospective juror Nos. 63, 66, 68, and 87 were excused because "they said they couldn't handle the death penalty." Kirkland's brief does not make clear whether he is claiming that they were *erroneously* excused. If he is making such a claim, it lacks merit. Prospective juror Nos. 66, 68, and 87 all stated expressly that they could not fairly consider imposing a death sentence and could not sign a death verdict. As for prospective juror No. 63, he was excused on a *defense* challenge for cause due to his bias *in favor of* a death sentence; he favored an automatic death sentence for all murderers and said no possible mitigation could outweigh two aggravated murders. Thus, any error in

14

excusing prospective juror No. 63 could only have benefited Kirkland. And if there was any error that benefited the state by excusing prospective juror No. 63, Kirkland invited it by challenging him for cause. *See State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 279.

### 3. Jury-Questionnaire Cover Page

{¶ 61} In his second proposition of law, Kirkland contends that the cover page of the jury questionnaire discouraged candid responses and thereby impaired the adequacy of voir dire. The cover page contained the following notice:

### *POTENTIAL JURORS*

- Please be aware that the following questionnaire you will fill out may be subject to review by the media or others pursuant to a public records request.

- Please also note that no actual identification information will be released. Any information you provide on your questionnaires that could be used to individually identify you would be deleted or blacked out before any questionnaires would be released.

(Underlining and boldface sic.) Before voir dire, the defense requested that the cover page be omitted. The trial court denied the request.

{¶ 62} Kirkland argues that by giving the prospective jurors notice that the questionnaires were subject to disclosure, the cover page exerted a "chilling effect" on them, discouraging candid answers by calling their attention to the possibility that their answers could be made public. But we have said that "trial courts should * * * conspicuously advise prospective jurors in writing that * * * their responses may be subject to public disclosure." *State ex rel. Beacon Journal Publishing Co. v. Bond*, 98 Ohio St.3d 146, 2002-Ohio-7117, 781 N.E.2d 180, ¶ 26.

{¶ 63} Moreover, the prospective jurors were not told *only* that the questionnaires were subject to disclosure; they were also told that personal identifying information would be deleted before any disclosure. In light of that assurance, Kirkland's claim of a "chilling effect" amounts to speculation. The trial court's suggestion that prospective jurors concerned about privacy would find the assurance comforting—and as a consequence be more candid than otherwise—is at least equally plausible.

{¶ 64} And the trial court affirmatively encouraged candor when it told the prospective jurors to "answer the questionnaires as if you were answering the questions in the courtroom" and instructed, "[T]he oath that you took earlier to well and truly answer all questions applies to * * * the questionnaire." The prospective jurors understood that they were sworn to answer the questionnaire truthfully. The trial court reasonably declined to assume that the cover-page notice would cause prospective jurors to violate their oath.

{¶ 65} Finally, we note that the jury questionnaire is not the sole, or even the principal, means by which litigants learn about prospective jurors. It is the voir dire itself—the face-to-face exchange between the prospective jurors and counsel—that is central to obtaining an impartial jury. The voir dire process gave defense counsel a full opportunity to question the prospective jurors and thereby elicit complete and candid answers from them.

{¶ 66} The trial court did not deny Kirkland an adequate opportunity for voir dire by including the cover page with the questionnaire. Kirkland's second proposition of law is overruled.

4. Failure to Dismiss Allegedly Biased Juror

{¶ 67} In his third proposition of law, Kirkland contends that one of the prospective jurors who ended up seated on the jury, prospective juror No. 36, favored an automatic death penalty in every murder case and therefore should have

been removed. However, Kirkland never challenged this prospective juror for cause; he has therefore forfeited this claim, absent plain error.

{¶ 68} On her questionnaire, prospective juror No. 36 checked boxes indicating that the death penalty is "[a]ppropriate in every case where someone has been murdered" and "should always be used as the punishment for every murder."

{¶ 69} On voir dire, defense counsel asked the panel members as a group whether they understood that the death sentence is not automatic:

> And just because Mr. Kirkland has been found guilty by a prior jury does not mean that Mr. Kirkland automatically gets the death penalty. Fair? Everybody gets that?
>
> Just because a jury has said guilty, that he is guilty of aggravated murder and specifications associated with aggravated murder, the case is not over. Everybody understands that, right? Good.

No prospective juror responded to these questions.

{¶ 70} Defense counsel also briefly questioned prospective juror No. 36 about the views expressed on her questionnaire:

> MR. CUTCHER [defense counsel]: I think you listed the death penalty is necessary?
>
> [Prospective juror No. 36]: Yes.
>
> MR. CUTCHER: Did you mean necessary in some cases, all cases?
>
> [Prospective juror No. 36]: *Some cases*.

MR. CUTCHER: Thank you for correcting me so quickly. The death penalty should always be used as a punishment for every murder. You put you agreed with that.

[Prospective juror No. 36]: In answering the question, yes, *at the time*, yes. I answered yes.

MR. CUTCHER: So you don't think it is appropriate in every case?

[Prospective juror No. 36]: In listening to—there are so many different cases that was discussed earlier today, I don't know how to answer that honestly.

MR. CUTCHER: That's all right. I didn't mean to put you on the spot.

(Emphasis added.) Defense counsel asked no further questions of prospective juror No. 36. Neither did the trial court. The defense did not challenge prospective juror No. 36 for cause, and she served on the jury in the resentencing hearing.

{¶ 71} By declining to challenge prospective juror No. 36 for cause, Kirkland forfeited this claim. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 78. For this court to consider this claim, Kirkland must show plain error: that an error occurred, that it was plain, and that it affected his substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). If he makes this showing, we must decide whether we will, in our discretion, correct the error. *Id.*

{¶ 72} A plain error is "an 'obvious' defect in the trial proceedings." *Id.* To qualify as correctible plain error, the defect "must have affected 'substantial rights,' " which "mean[s] that the trial court's error must have affected the outcome of the trial." *Id.* We have held that a defendant must "demonstrate a reasonable

*probability* that the error resulted in prejudice." (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

{¶ 73} "Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997), citing *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). Here, the questionnaire contains an expression of partiality on the part of prospective juror No. 36. A juror who will automatically impose a death sentence is biased. *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Hence, by stating that capital punishment should be imposed on all murderers, prospective juror No. 36 revealed "a state of mind that leads to an inference that [she would] not act with entire impartiality," *Torres* at 43.

{¶ 74} But the expression of partiality does not end the analysis. A court will find actual bias when a prospective juror's unambiguous statement of partiality is "coupled with a lack of juror rehabilitation or juror assurances of impartiality." *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir.2004).

{¶ 75} Prospective juror No. 36's questionnaire statement was not coupled with a lack of juror rehabilitation. While she did not say she could set aside the opinion expressed on her questionnaire, she did indicate that she no longer held that opinion. As soon as defense counsel brought up her statement on the questionnaire, she immediately contradicted it. These responses showed that prospective juror No. 36 had reconsidered her original opinion in response to what she heard during voir dire, and they indicated a newfound understanding that a single dogmatic response is not appropriate to every murder conviction.

{¶ 76} When a prospective juror gives contradictory answers, it is the trial judge's function to determine her true state of mind. *Jones*, 91 Ohio St.3d at 339, 744 N.E.2d 1163. The question whether a juror is impartial is "one of historical fact." *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847

(1984); hence, a trial court's finding is entitled to deference on appellate review. *E.g.*, *State v. Webb*, 70 Ohio St.3d 325, 339, 638 N.E.2d 1023 (1994).

{¶ 77} Given the prospective juror's change of mind during voir dire, we cannot find that the trial court committed an obvious error in failing to dismiss her sua sponte. Accordingly, no plain error exists here. We therefore overrule Kirkland's third proposition of law.

### B. Ineffective Assistance of Counsel

{¶ 78} In his sixth proposition of law, Kirkland contends that his counsel rendered ineffective assistance during the resentencing hearing. To establish ineffective assistance, Kirkland must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. Kirkland contends that his trial counsel failed him in three ways, each of which we address below.

### 1. Ineffective Voir Dire

{¶ 79} In part one of his sixth proposition of law, Kirkland recasts his juror-bias claim regarding prospective juror No. 36, who ended up seated on the jury, as an ineffective-assistance claim. According to Kirkland, his counsel should have "question[ed prospective juror No. 36] specifically on [her] views on the death penalty" and should have "remov[ed her] from the pool" (i.e., challenged her for cause).

{¶ 80} There are two problems with this argument. First, as Kirkland concedes, to show prejudice, he must show that the juror was actually biased against him. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67. Here, the record does not show that the juror was actually biased, since she

contradicted her questionnaire answers on voir dire. Second, there is no way to know what prospective juror No. 36 would have said if trial counsel had questioned her in greater depth. It would be speculative to assume that more or different questions would have exposed bias.

{¶ 81} At oral argument, Kirkland cited our recent decision in *State v. Bates*, __ Ohio St.3d ___, 2020-Ohio-634, 149 N.E.3d 475, in which we reversed a capital conviction for ineffective assistance of counsel. In *Bates*, we determined that defense counsel rendered constitutionally ineffective assistance by failing to challenge, or even question, a seated juror who had expressed racial bias on her questionnaire. But this case is easily distinguishable from *Bates*. Unlike Kirkland's counsel, defense counsel in *Bates* asked *no* questions of the juror relating to the biased answer on her questionnaire. *Id.* at ¶ 29, 31-32. And as a result, the juror in *Bates*—unlike prospective juror No. 36—said nothing on voir dire to counteract the biased statement on the questionnaire. *Id*. at ¶ 36.

{¶ 82} In this case, we can find neither deficient performance by counsel nor a reasonable probability that the result would have been different but for counsel's alleged errors. Accordingly, we reject Kirkland's claim of ineffective assistance with respect to prospective juror No. 36.

2. Failure to Cross-Examine Witnesses

{¶ 83} Kirkland also contends that his trial counsel performed deficiently by declining to cross-examine four prosecution witnesses: Casonya's grandmother, who reported her missing; Mary Jo Newton's sister, who testified about Newton's substance-abuse, behavioral, and psychiatric problems; Detective Witherell, whose video-recorded interrogation of Kirkland was played for the jury; and Detective Hilbert, who investigated the murders of Casonya and Newton and who also interrogated Kirkland.

{¶ 84} Kirkland concedes that to demonstrate that his counsel provided ineffective assistance by failing to cross-examine these witnesses, he must identify

questions that counsel should have asked and provide some sense of the information that might have been elicited. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 155. Yet Kirkland fails to do so. He merely asserts that counsel "should have used these witnesses to bring out and develop mitigating factors as to the crimes and as to Kirkland." This claim is vague and speculative: Kirkland neither indicates what kind of mitigating information trial counsel could have attempted to elicit from these witnesses nor gives any reason to suppose that the witnesses had any such information.[2]

### 3. Failure to Call Witnesses

{¶ 85} Finally, Kirkland contends that his trial counsel should have called more mitigation witnesses. He argues that counsel should have called family members who could have corroborated his claims of childhood abuse and neglect. He also argues that counsel should have called an expert on domestic violence and one or more of the doctors who treated Kirkland when he was admitted to the University of Cincinnati Hospital for depression in 2008.

{¶ 86} Kirkland's claim regarding his family rests on speculation. Nothing in the record shows what testimony his relatives would have given had they taken the stand. Accordingly, he can show neither deficient performance nor prejudice. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 121, 124.

{¶ 87} As for Kirkland's 2008 hospitalizations, the jury knew about them, because an expert witness called by the defense discussed them in her testimony. Kirkland does not say what further testimony on this point would have added, except to speculate that testimony from a doctor who had treated him "would have impressed upon the jury his compromised mental state." Likewise, Kirkland fails

---

2. We are unable to even guess what mitigating evidence Kirkland believes his trial counsel might have elicited from Casonya's grandmother or Newton's sister. Nothing in the record indicates that they knew anything about Kirkland or had any firsthand information about the murders.

to explain what mitigation testimony a domestic-violence expert might have offered. Kirkland's sixth proposition of law is overruled.

## C. Evidentiary Issues

### 1. Evidence Relating to Other Murders

#### a. Newton and Rolison Murders

{¶ 88} In his fourth proposition of law, Kirkland contends that the state violated Evid.R. 404(B) by introducing evidence relating to the murders of Mary Jo Newton and Kimya Rolison, because the resentencing hearing was not for those two murders—it was for only the aggravated murders of Esme and Casonya.

{¶ 89} This proposition is meritless. Evid.R 404(B) provides: "Evidence of *other* crimes, wrongs, or acts is not admissible to prove the character of a person in order *to show action in conformity therewith*." (Emphasis added.) At the guilt phase of Kirkland's original trial, the jury found Kirkland guilty of murdering Esme and Casonya as part of a course of conduct including two or more intentional killings. The Newton and Rolison murders were part of that course of conduct, and the jury was required to weigh the course-of-conduct specification in recommending a sentence. Thus, for purposes of the resentencing hearing that is the subject of this appeal, the Newton and Rolison murders were not "*other* crimes, wrongs, or acts."

{¶ 90} Nor were the Newton and Rolison murders introduced to prove Kirkland's character in order *to show that he acted in conformity therewith*. That is, they were not introduced to show that he was guilty of murdering Esme and Casonya. He had already been found guilty of those murders; guilt was not at issue in this resentencing hearing.

{¶ 91} Kirkland also contends that evidence relating to the Newton and Rolison murders should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice, Evid.R. 403(A). This assertion has even less merit. Again, the Newton and Rolison murders were part

of Kirkland's course of conduct, which was one of the aggravating circumstances the jury was *required* to weigh against the mitigating factors. As such, they were central to the sentencing determination the jury had to make and could not be unfairly prejudicial.

### b. 1987 Leola Douglas Murder

{¶ 92} Kirkland also contends that during the cross-examination of a defense mitigation witness, the prosecutor introduced evidence that Kirkland had been convicted of a 1987 homicide, a homicide that was not part of the course of conduct.

{¶ 93} The 1987 homicide first came up on cross-examination during the video deposition of defense medical expert Joseph Wu. On direct examination, Dr. Wu had testified that damage to the brain's frontal lobe can impair the brain's ability to regulate aggression and cause significant changes in personality. Dr. Wu further testified that Kirkland had a history of multiple traumatic brain injuries, including one in 2004, after which, according to Dr. Wu, a friend of Kirkland's "reported that he became a completely different person," and another in 2006.

{¶ 94} On cross-examination, the prosecution asked Dr. Wu whether Kirkland "was exhibiting extremely violent behavior * * * well before 2004." And Dr. Wu admitted that he was. The prosecution then called his attention to a presentence investigation report "for a homicide [Kirkland] committed in * * * May 1987 when he killed his uncle's girlfriend and set the house on fire to cover that up."

{¶ 95} The defense objected, arguing that the 1987 homicide was irrelevant and that its probative value was significantly outweighed by its unfair prejudicial effect. During the resentencing hearing, the trial judge overruled this objection; Dr. Wu's video deposition was then played for the jury. Kirkland makes no claim that the trial court erred by overruling that objection.

{¶ 96} After the jury heard Dr. Wu's deposition, the defense presented another expert, psychologist Patti van Eys. On cross-examination, the prosecutor asked Dr. van Eys whether she had received a presentence report indicating that "the defendant basically did the same thing to another woman when he was 18 years old." Dr. van Eys acknowledged that she had received the report. The prosecutor then asked:

> And * * * the defendant and the victim * * * engaged in a verbal altercation. According to the defendant, she * * * threatened to tell his uncle, who was her boyfriend, that they had been having sexual intercourse. And at that point the defendant became angry, choked her to death and then poured lighter fluid on her and set her on fire; is that correct?

{¶ 97} Later, the prosecutor asked Dr. van Eys two other questions about the 1987 murder. Explaining her belief that Kirkland did not display antisocial personality disorder, Dr. van Eys testified that Kirkland did not "externalize all the blame" for his actions. The prosecutor asked: "Leola Douglas, the first victim, back in 1987, he killed her because she threatened to rat him out. * * * Isn't that externalizing the blame?" Finally, the prosecutor asked Dr. van Eys whether she knew that Kirkland had been suspected of the murders of Newton and Casonya in 2006 "because the police saw he had done something very similar years ago."

{¶ 98} The defense did not object to any of these references to the 1987 murder. Kirkland's failure to object forfeits this issue, absent plain error. We find no plain error here because the jury already knew about the 1987 murder. That murder was properly introduced during Dr. Wu's cross-examination, as the trial court ruled and as Kirkland does not dispute. Thus, Kirkland cannot show a reasonable probability that mentioning it during the cross-examination of Dr. van

Eys resulted in prejudice. *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22.

**{¶ 99}** We overrule Kirkland's fourth proposition of law.

2. Gruesome Photographs

**{¶ 100}** In his fifth proposition of law, Kirkland argues that gruesome autopsy photographs were improperly admitted into evidence at the resentencing hearing.

**{¶ 101}** "[T]he mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible." *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984). However, this court has established "a stricter evidentiary standard" for admitting gruesome photographs in capital cases. *State v. Morales*, 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267 (1987). "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *Maurer* at paragraph seven of the syllabus. Unlike Evid.R. 403, which turns on whether prejudice *substantially* outweighs probative value, this standard requires "a simple balancing" of prejudice and probative value. *Morales* at 258. In other words, if the probative value of a photograph in a capital case does not, in a simple balancing of the relative values, outweigh the danger of prejudice to the defendant, the evidence must be excluded. *Id.* A trial court's decision that a photo satisfies this standard is reviewable only for abuse of discretion. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69; *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 96.

*a. Autopsy Photographs*

{¶ 102} Kirkland's argument focuses principally on the autopsy photographs that were introduced at the resentencing hearing. The trial court admitted the following autopsy photographs: state's exhibit Nos. 17A through 17J, 33A through 33P, 20A through 20E, and 23A through 23H.

{¶ 103} Ten photographs from Casonya's autopsy were admitted. One of these, state's exhibit No. 17D, depicts a bone with little or no flesh and is not gruesome. The others, which depict charred and partly decomposed portions of the body, are gruesome.

{¶ 104} A Hamilton County deputy coroner testified that because of the "serious severe burning" of the body, it "seemed to be very likely" that an accelerant had been used. Each photo is of a different body part, and each photo had probative value in that collectively, they show the full extent of the burning. And there was little repetition in this group of photographs; only one, state's exhibit No. 17G, appears to be repetitive in that it shows nothing that is not also shown in other admitted photographs.

{¶ 105} The trial court admitted 16 photographs from Esme's autopsy, state's exhibit Nos. 33A through 33P. Her body was found soon after the murder and was only partly burned. Only three of these photos qualify as gruesome: state's exhibit Nos. 33A, 33N, and 33P.

{¶ 106} State's exhibit No. 33A shows the body lying on a table and gives an overview of which areas were burned. State's exhibit No. 33P is a closer image of the burned areas. While graphic, this photograph also shows a genital injury not caused by burning. The Hamilton County chief deputy coroner, Dr. Karen Looman, testified that this injury could have been caused by "something attempting to penetrate [Esme's] vagina," a fact relevant to the attempted-rape felony-murder specifications. No other photograph shows this injury. State's exhibit No. 33N shows the head with the scalp peeled back to expose the skull. This shows that

hemorrhaging took place underneath the scalp; from this, Dr. Looman concluded that Esme had been struck on the back of the head hard enough to at least stun her.

{¶ 107} In five other photographs, state's exhibit Nos. 33C, 33D, 33E, 33M, and 33O, some charred flesh is visible. In two of them, it is only barely visible. In no photograph is it prominently depicted. The eight remaining photographs show nothing worse than small abrasions, petechiae, and ligature marks.

{¶ 108} Five photographs from Newton's autopsy were admitted. Only two are gruesome—state's exhibit Nos. 20A and 20B, which show Newton's charred body from different angles. State's exhibit No. 20A, a full-length view of the body lying face down on a table, illustrates the deputy coroner's testimony that the body went into "pugilistic posturing" when the fire's heat made the arm and leg muscles flex, indicating that the body was burned before rigor mortis set in. State's exhibit No. 20B shows the victim's face with the lips retracted, helping to confirm that the body was burned before rigor mortis set in. These photographs are not repetitive: each shows something the other does not. Both were used to support the same conclusion about when the body was burned with respect to rigor mortis, but using two photographs for that purpose was not unreasonably cumulative.

{¶ 109} State's exhibit Nos. 20C through 20E show Newton's skull and lower jaw *after* the burned flesh was removed. All were probative. State's exhibit No. 20C shows her head injuries; State's exhibit Nos. 20D and E show the dental work that was used to identify her.

{¶ 110} Finally, eight photographs show Rolison's skeletonized remains in the coroner's office. These photographs are not gruesome: they depict no discernible blood, bodily fluids, wounds, damaged or decomposed flesh, or insect activity.

{¶ 111} Kirkland contends that the trial court erred in admitting the autopsy photographs of Newton and Rolison because the resentencing hearing addressed

only the aggravated murders of Esme and Casonya, and not the murders of Newton and Rolison. But as we noted earlier in response to Kirkland's fourth proposition of law, the Newton and Rolison murders were part of Kirkland's course of conduct and the jury was *required* to weigh that aggravating circumstance against the mitigating factors in making its sentencing determination.

{¶ 112} In all, 14 gruesome autopsy photographs were admitted. Repetition was minimal; with the one noted exception, each has some probative value not found in the others. We conclude that the trial court did not abuse its discretion in admitting them. The probative value of each photograph outweighed any prejudicial effect, and any repetition did not materially prejudice Kirkland. Moreover, our independent review of the sentence can minimize any improper impact on the sentence that may have arisen from the admission of these photographs. *See, e.g., State v. Twyford*, 94 Ohio St.3d 340, 358, 763 N.E.2d 122 (2002).

*b. Crime-Scene Photographs*

{¶ 113} Photographs of the victims at the crime scenes were also introduced during the resentencing hearing. Kirkland's brief makes cursory mention of these photographs but fails to provide any explanation to support his argument that the trial court erred in admitting them. "We are not obligated to * * * formulate legal arguments on behalf of the parties," *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19, and we decline to do so here.

{¶ 114} Kirkland's fifth proposition of law is overruled.

**D. Prosecutorial Misconduct**

{¶ 115} In his seventh proposition of law, Kirkland contends that prosecutorial misconduct in closing arguments denied him a fair trial. When reviewing a claim of prosecutorial misconduct, our inquiry is twofold: we must first decide whether the prosecutor's actions were improper, and if so, we consider whether the conduct prejudicially affected the defendant's substantial rights. *State*

*v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 228. "The touchstone of due process analysis * * * is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Thus, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *see generally State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 78. Kirkland cites three instances of alleged misconduct. First, Kirkland contends that the prosecutor committed misconduct by speculating as follows on the dying thoughts of Esme K.: "You know maybe earlier she would have said, please don't hurt me. At this point, *she probably is praying to God* as the vomit filled her throat, *please let me die*." (Emphasis added.) The trial court overruled an objection by the defense but immediately instructed the jury, "[T]his is closing arguments, not evidence. You make a decision what the evidence is."

**{¶ 116}** This court has said that it is improper for prosecutors to comment on what the victim was thinking when he or she died, as it " 'invites the jury to speculate on facts not in evidence.' " *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 122, quoting *State v. Wogenstahl*, 75 Ohio St.3d 344, 357, 662 N.E.2d 311 (1996); *see also State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 147, citing *State v. Combs*, 62 Ohio St.3d 278, 283, 581 N.E.2d 1071 (1991).

**{¶ 117}** Although the trial court should have sustained the defense objection, it nevertheless mitigated the impact of the prosecutor's statement by instructing the jury that the closing argument was "not evidence" and that it was for the jury to decide what the evidence showed. And the court repeated that instruction before sending the jury out to deliberate. *See State v. Apanovitch*, 33

Ohio St.3d 19, 24, 514 N.E.2d 394 (1987) (jury instruction that closing arguments are not evidence contributed to determination that prosecutor's improper statements did not deny a fair trial).

{¶ 118} Kirkland also argues that the prosecutor improperly "belittled" and "personally attacked" Dr. Wu. The prosecutor said:

> First we have got Dr. Wu. * * * I have been in the prosecutor's office—this is my 38th year. *I have been doing this a long time. I know I look too young to be that old. This is what I have done for a long time. I have heard of experts like this forever. I have never personally seen someone I would hold in less repute* in an actual case than him.

(Emphasis added.) The defense objected that the prosecutor was "commenting on the veracity of a witness" and being "[p]ersonal." The prosecutor withdrew the comment, and the trial court made no ruling.

{¶ 119} An attorney may not express his personal opinion as to the credibility of a witness, *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984), unless the opinion is based on evidence presented at trial, *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 159. Thus, the prosecutor could properly attack Dr. Wu's credibility, so long as his attack was based on the evidence. But the above argument was not. The prosecutor instead cited his own experience and placed his personal credibility in issue. *See State v. Waddy*, 63 Ohio St.3d 424, 435-436, 588 N.E.2d 819 (1992) (argument inviting jury to substitute prosecutor's experience for its own evaluation was improper).

{¶ 120} However, the prosecutor's prompt withdrawal of the improper comment diminished its prejudicial effect. *See United States v. Jackson*, 990 F.2d 251, 255 (6th Cir.1993); *State v. Green*, 2d Dist. Greene No. 2007 CA 2, 2009-

Ohio-5529, ¶ 141.  Moreover, he immediately changed course and attacked Dr. Wu's testimony properly, by discussing Dr. Wu's cross-examination and the testimony of the state's rebuttal witnesses.

{¶ 121} Finally, Kirkland argues that the prosecutor improperly "disparaged" the defense for not putting on evidence to support its claim that Kirkland was abused in childhood.  The prosecutor stated that only Kirkland himself said he was abused: "He is the only one who said he was abused.  His sisters don't say it.  His mom doesn't say it."  The prosecutor noted that Kirkland could have subpoenaed witnesses to support his allegations but had not.  The trial court overruled an objection by the defense.

{¶ 122} Like the trial court, we see nothing improper in these arguments. "[T]he state may comment upon a defendant's failure to offer evidence in support of its case. * * * Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent."  *State v. Collins*, 89 Ohio St.3d 524, 527-528, 733 N.E.2d 1118 (2000).  This is especially true in the penalty phase of a capital case because the defendant has the burden of persuading the sentencer of the existence of mitigating factors.  *See State v. Jenkins*, 15 Ohio St.3d 164, 171-172, 473 N.E.2d 264 (1984).  The prosecutor committed no misconduct by asking the jury to consider whether Kirkland had shown that the mitigating factors he claimed to exist really did exist.

{¶ 123} Kirkland's claim that the arguments in question were "inflammatory" and "denigrate[d]" defense counsel is incorrect.  Attacking the defense *case* as weak because it lacks evidentiary support is not the same as attacking defense counsel personally.  The cited portions of the state's argument do not mention defense counsel, even by implication.

{¶ 124} When evaluating prejudice, we consider the effect any improper comments may have had on the jury in the context of the entire proceeding.

*Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, at ¶ 228, citing *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). Kirkland has identified two improper comments by the prosecution, both of which were mitigated to a degree. These isolated instances did not "pervade the trial to such a degree that there was a denial of due process," *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 149. We therefore conclude that any error with respect to the prosecutor's comments did not prejudicially affect Kirkland's substantial rights. Kirkland's seventh proposition of law is overruled.

### E. Jury Instructions and Verdict Forms

{¶ 125} In his eighth proposition of law, Kirkland contends that the trial court erred by denying his requests regarding the wording of two jury instructions and the verdict forms.

#### 1. Parole-Eligibility Instruction

{¶ 126} Kirkland asked the trial court to instruct the jury as follows:

Under no circumstances could Anthony Kirkland ever be released from prison on parole if under a sentence of life in prison without the possibility of parole. Likewise, if you were to select one of the other two life imprisonment options, then Anthony Kirkland would in fact stay in prison for a minimum of either twenty-five or thirty full years before he could even be considered for parole much less actually being granted parole.

The court did not give that instruction, but gave this one:

During your deliberations you will decide whether Anthony Kirkland shall be sentenced to, one, life imprisonment without parole eligibility for 25 full years, or, two, life imprisonment

without parole eligibility for 30 full years, or, three, life imprisonment without the possibility of parole, or four, death.

**{¶ 127}** Kirkland contends that without his proposed instruction, the jury probably thought a defendant sentenced to life would "be released in less time than the actual wording of the law allows." However, we have rejected such claims and upheld instructions similar to the one the trial court gave here. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 215-219; *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 102-103. The instruction that was given adequately conveyed to the jurors when, if ever, Kirkland would be eligible for parole if they chose one of the life-sentence options. *See Davis* at ¶ 219 and *Jackson* at ¶ 103.

2. Moral-Culpability Instruction

**{¶ 128}** Kirkland asked the trial court to provide the following instruction to the jury: "Mitigating factors are factors that *lessen the moral culpability or* diminish the appropriateness of a death sentence." (Emphasis added.) The trial court's instructions did not include the words "moral culpability." The court instructed the jury as follows:

Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate. Mitigating factors are factors that diminish the appropriateness of a death sentence.

**{¶ 129}** Factors that diminish the offender's moral culpability are mitigating. *See State v. Steffen*, 31 Ohio St.3d 111, 129, 509 N.E.2d 383 (1987); *State v. Sowell*, 39 Ohio St.3d 322, 325, 530 N.E.2d 1294 (1988). And a sentencing jury must be free to give a reasoned moral response to a capital defendant's

mitigating evidence—"*particularly that evidence which tends to diminish his culpability.*" (Emphasis added.) *Brewer v. Quarterman*, 550 U.S. 286, 289, 127 S.Ct. 1706, 167 L.Ed.2d 622 (2007).

{¶ 130} But it does not follow that a capital defendant is entitled to specific "moral culpability" language in the jury instructions. Mitigating factors "are not *necessarily* related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender * * * should be sentenced to death." (Emphasis added.) *State v. Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831 (1988), paragraph one of the syllabus.

{¶ 131} The trial court's instruction contained no language restricting the jury's ability to give a reasoned moral response to evidence tending to diminish Kirkland's culpability. Instead of singling out one category of mitigating factors (those related to moral culpability), the instruction was inclusive, allowing the jury to consider as mitigation *anything* that "diminish[ed] the appropriateness of a death sentence" or "weigh[ed] in favor of a decision that a life sentence * * * is appropriate." Moreover, the trial court instructed that mitigating factors included "any other factors that weigh in favor of a sentence other than death."

{¶ 132} The trial court further instructed that mitigating factors included the "history, character, and background of the defendant." This instruction allowed the jury to take account of Dr. van Eys's testimony that Kirkland was an abused child. Finally, the trial court instructed that the jury should consider as a mitigating factor whether Kirkland lacked the substantial mental capacity to conform his conduct to the law due to a mental disease or defect. Thus, "considered in context, the trial court's instructions adequately informed the jury as to the relevant mitigating factors it must consider." *State v. Wilson*, 74 Ohio St.3d 381, 397, 659 N.E.2d 292 (1996).

### 3. Verdict Forms (*Caldwell* Claim)

{¶ 133} Kirkland's final argument under this proposition of law relates to his request to amend the verdict forms. The verdict forms for each capital count contained the language: "We therefore unanimously find that the sentence of death *should* be imposed upon Anthony Kirkland." (Emphasis added.) Kirkland asked that "should" be changed to "shall" because "should" implied that a jury verdict in favor of death was a recommendation, which Kirkland claimed would unconstitutionally diminish the jury's sense of responsibility for the death verdict. *See generally Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

{¶ 134} *Caldwell*, however, does not preclude accurately informing the jury that its verdict recommending death is a recommendation. *See*, *e.g.*, *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 88. Kirkland was not entitled to have the verdict forms changed to reflect his erroneous reading of *Caldwell*. Kirkland's eighth proposition of law is overruled.

### F. Requiring Defendant to Wear Stun Cuff

{¶ 135} In his tenth proposition of law, Kirkland contends that the trial court denied him due process of law by requiring him to stand trial wearing a "stun cuff," a remotely controlled taser worn around the ankle, underneath the pants leg.

{¶ 136} Due process "prohibit[s] the use of physical restraints *visible to the jury* absent a trial court determination * * * that they are justified by a state interest specific to a particular trial." (Emphasis added.) *Deck v. Missouri*, 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). This applies to both phases of a capital proceeding. *Id*. at 632-633.

{¶ 137} Before trial, at the request of the Hamilton County sheriff's department, the trial court held a hearing on security measures. Deputy Sheriff Emily Rose testified, asking that Kirkland be ordered to wear a stun cuff. Although the defense questioned Rose, it did not object to or argue against the use of a stun

cuff. The trial judge granted the request, cautioning, "[The cuff] needs to stay not visible" to the jury.

{¶ 138} Kirkland argues that the stun cuff was not needed to maintain courtroom security, because there was no evidence he was a security threat. He further contends that worrying about being tased distracted him from "adequately and effectively participat[ing] in his defense."

{¶ 139} By failing to object at trial, Kirkland forfeited all but plain error, and no plain error occurred here. The prohibition in *Deck*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953, "concerned only *visible* restraints at trial" (emphasis sic), *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir.2008), and thus, "a claim based on *Deck* 'rises or falls on the question of whether the [restraining device] was visible to the jury,' " *Leonard v. Warden*, 846 F.3d 832, 842 (6th Cir.2017), quoting *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir.2009). The trial court's order specified that "[t]he physical restraints used at trial shall be concealed so as not to be visible to the jury." And nothing in the record suggests that the jury could see the stun cuff.

{¶ 140} Kirkland does not dispute that the cuff was concealed but argues that the officer holding the remote control was visible to the jury. Perhaps, but nothing in the record suggests that jurors could see the remote control either. Speculation about the remote control is not enough to establish plain error. Hence, Kirkland's tenth proposition of law is overruled.

### G. Cumulative Error

{¶ 141} In his 11th and final proposition of law, Kirkland claims to have identified "numerous errors any one of which warrant * * * granting relief from a sentence of death," but he asks us to view the errors together if we determine that none of the errors is sufficient on its own to warrant relief. Invoking the doctrine of cumulative error, *see generally State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987), he claims that the total effect of these errors made his

resentencing fundamentally unfair even if they were individually harmless. In fact, Kirkland has failed to identify any significant error; he was resentenced in a fundamentally fair proceeding. Accordingly, his 11th proposition of law is overruled.

## H. Independent Sentence Evaluation

{¶ 142} Kirkland's ninth proposition of law invokes our statutory duty to independently review sentences of death. This court may affirm a death sentence "only if the * * * court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case," R.C. 2929.05(A), beyond a reasonable doubt, R.C. 2929.03(D)(1). In this proposition, Kirkland asks us to find on independent review that the aggravating circumstances do not outweigh the mitigating factors and to replace his death sentences with sentences of life without parole for the murders of Casonya C. and Esme K.

{¶ 143} On independent review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentences are proportionate to those affirmed in similar cases. R.C. 2929.05(A).

### 1. Merger

{¶ 144} We begin by noting that Counts Two and Four involve the aggravated murder of a single victim, Casonya, and therefore merge for sentencing purposes. *See State v. Lawson*, 64 Ohio St.3d 336, 350, 595 N.E.2d 902 (1992). The course-of-conduct specifications attached to those counts also merge with each other. *Id.* For the same reason, Counts Nine and Eleven (aggravated murder of Esme) merge, as do their course-of-conduct specifications.

### 2. Aggravating Circumstances

{¶ 145} In the guilt phase of Kirkland's original trial, the jury found him guilty of three aggravating circumstances as to each murder: felony-murder

38

predicated on attempted rape, felony-murder predicated on aggravated robbery, and course of conduct involving two or more intentional killings. (The trial court merged the escaping-detection specifications with the felony-murder specifications for Counts Nine and Eleven.) As we found in *Kirkland I*, the evidence at trial was sufficient to establish these aggravating circumstances beyond a reasonable doubt. 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 4-58 (recounting the state's evidence at trial).

### 3. Mitigating Factors

#### a. Traumatic Brain Injuries

{¶ 146} Dr. Joseph Wu testified on Kirkland's behalf at the resentencing hearing. Dr. Wu is a diplomate in psychiatry and professor emeritus at the University of California, Irvine. He has studied, and published peer-reviewed articles on, the use of positron-emission tomography ("PET") and magnetic-resonance imaging ("MRI") to diagnose various psychiatric conditions, including traumatic brain injury. He is not, however, a radiologist.

{¶ 147} Dr. Wu had three brain scans performed on Kirkland at the Wexner Medical Center: a PET scan, an MRI quantitative volumetric scan, and an MRI diffusion tensor imaging ("DTI") scan.

{¶ 148} According to Dr. Wu, the PET scan revealed two significant abnormalities in Kirkland's brain. Dr. Wu found that the frontal cortex showed "metabolic decrease" relative to the occipital cortex. He also found decreased activity in the neocortex compared to the cerebellum; normally, he explained, the neocortex has a significantly higher level of activity than the cerebellum. This pattern, Dr. Wu believed, was consistent with multiple head traumas.

{¶ 149} Dr. Wu analyzed the DTI scan using a "voxel-wise" quantitative analysis. According to Dr. Wu, this is a "much more reliable, much more sensitive way of detecting abnormalities" in DTI scans of people with histories of traumatic

brain injury and this analysis showed abnormal decreases and increases in fractional anisotropy, indicating brain injury in Kirkland.

{¶ 150} Dr. Wu testified that the MRI quantitative volumetric scan showed an "abnormal increase in the right amygdala," and he stated, "[T]he only condition that I'm aware of that cause[s] a significant increase in the amygdala is significant early childhood neglect." But only one side of the amygdala was enlarged; Dr. Wu was aware of no studies showing such a result. According to Dr. Wu, this is another indication of brain trauma, because trauma causes shrinkage; in Dr. Wu's opinion, trauma probably caused one side of Kirkland's enlarged amygdala to atrophy to normal size.

{¶ 151} Dr. Wu also looked at Kirkland's medical history. He found "at least four separate events" consistent with the abnormalities he found in his reading of the PET and MRI scans. Kirkland allegedly was abused by his father from age 6 to age 14, resulting in head contusions. At 17, he was involved in a workplace accident, following which he reported memory loss and numbness in his extremities. In 2004, at age 36, Kirkland fell off a bicycle, fracturing the right side of his face. In 2006, Dr. Wu testified, Kirkland "sustained a traumatic brain injury with a small hematoma in the left upper temporal area" in an auto accident. Dr. Wu testified that both the "significant abnormalities" in Kirkland's scans and his medical history were consistent with multiple traumatic brain injuries.

{¶ 152} Dr. Wu testified about how such injuries can affect the personality. Frontal-lobe damage can cause "significant alteration in your ability to regulate aggression," which can affect judgment and impulse control. The effect is exacerbated by "significant abuse and neglect" in childhood; the combination "cause[s] a dramatic increase in the inability of an individual to regulate aggression."

{¶ 153} Dr. Wu concluded that Kirkland lacks the ability to control his aggressive impulses in "an uncontrolled, unmanaged environment" because of the

combination of brain injury, neglect, and abuse. When asked whether the degree of planning and execution involved in Kirkland's crimes was inconsistent with an inability to control impulses, Dr. Wu explained that a person whose history includes multiple brain traumas, neglect, and abuse loses the ability to calm his anger or aggressive impulses; hence, instead of being "momentary," his aggressive impulses continue to "rage on."

{¶ 154} The state called three witnesses to rebut Dr. Wu's testimony: Drs. Chadwick Wright, Alan Waxman, and Daniel Boulter.

{¶ 155} Dr. Wright, a radiologist at the Ohio State University Wexner Medical Center, examined the images from Kirkland's PET scan. Dr. Wright found the scan to be "a normal appearing scan" that indicated that "the brain is functioning properly." He saw no evidence in the PET scan to indicate traumatic brain injury.

{¶ 156} Dr. Waxman is the director of nuclear medicine at Cedars-Sinai Medical Center in Los Angeles. He sharply criticized Dr. Wu's theories and methods regarding PET scans.

{¶ 157} According to Dr. Waxman, PET scanning is not accepted as a tool for diagnosing traumatic brain injury. Dr. Waxman noted that it is the view of the American College of Radiology that PET scans are "not usually appropriate" for diagnosing head injuries, that the American Academy of Neurology regards PET scanning as still "investigational" as a tool for diagnosing head trauma, and that the European Association of Nuclear Medicine also does not recognize or accept brain imaging as a method for diagnosing head trauma. Dr. Waxman also cited a United States Department of Defense study finding that PET scans are not useful for diagnosing head trauma and a peer-reviewed 2015 article in the *Journal of Neurotrauma* finding that PET scans do not yield a "recognizable pattern" for traumatic brain injury.

{¶ 158} Dr. Waxman examined Kirkland's PET scan and found it "textbook normal," yielding "no evidence of traumatic brain injury." According to Dr. Waxman, Kirkland's scan "looked really good."

{¶ 159} Dr. Waxman disagreed with Dr. Wu's contention that metabolic decreases in the frontal cortex relative to the occipital cortex are an abnormality. Dr. Waxman testified, "You can't prescribe a particular psychological construct to these patterns" and, in fact, "a high percentage of people"—50 percent in one study—show metabolic decreases in the front of the brain relative to the back.

{¶ 160} In general, Dr. Waxman testified, Dr. Wu is wrong in seeing asymmetries as abnormal. Normal brains—including brains characterized as normal in Dr. Wu's database—have asymmetries. In Dr. Waxman's view, Dr. Wu is interpreting "normal variations" as abnormalities, resulting in false positives. Dr. Waxman testified that Dr. Wu "has read almost a thousand scans * * * and every single scan except one he has called abnormal." (On cross-examination, Dr. Wu testified that he has read about 100 scans, but he admitted that he had found abnormality in all but "a couple" of them.) In fact, Dr. Waxman said, "Dr. Wu has no idea what his error rate is" because it has never been scientifically determined.

{¶ 161} Dr. Waxman noted that the normal brains in Dr. Wu's database are usually those of people in their 30s, while Kirkland was nearly 50 at the time of his PET scan. Dr. Waxman testified that it would be normal for there to be a metabolic decrease in Kirkland's frontal lobe in comparison to those of people in their 30s. Indeed, according to Dr. Waxman, Kirkland's PET scan "is in the mid range of normal variation compared to Dr. Wu's own subjects."

{¶ 162} Dr. Boulter is a neuroradiologist and the clinical director of MRI at the Wexner Medical Center. He reviews MRI scans daily and has reviewed at least 20,000 brain MRI scans in his career. He reviewed the results of one of the MRI scans performed on Kirkland. He found no abnormality, and specifically, no evidence of traumatic brain injury.

{¶ 163} Unlike Dr. Wu, Dr. Boulter did not perform a voxel analysis. A voxel analysis, he testified, may be a useful tool in the future, but at present, it cannot be used to differentiate normal from abnormal. He further testified that the American College of Radiology's position is that it is not an appropriate tool for determining whether a person has suffered a traumatic brain injury.

### b. Childhood Abuse and Neglect

{¶ 164} The second focus of Kirkland's mitigation evidence was the psychological effects of childhood abuse and neglect. He presented one witness on this point: Dr. Patti van Eys, a clinical psychologist who works with children who have histories of abuse and neglect. Dr. van Eys interviewed Kirkland and administered the Adverse Childhood Experiences Survey and the Dissociative Experiences Scale. She also reviewed summaries of interviews with Kirkland, his mother, sister, brother, and a former girlfriend. She diagnosed Kirkland as suffering from posttraumatic stress disorder ("PTSD") with dissociation and "other specified dissociative disorder."

{¶ 165} Dr. van Eys testified that Kirkland told her that when he was young, his father beat him with his hands, brooms, and extension cords. Also, family members reported that Kirkland's mother was abused by Kirkland's father when Kirkland was a child. From the information provided to her, Dr. van Eys determined that Kirkland's father left the home when Kirkland was about 13 years old.[3] Kirkland also told Dr. van Eys that as a child, he was sexually abused by teenaged family members and a teenaged neighbor.

{¶ 166} Dr. van Eys explained that there are ten "adverse childhood experiences" that place a child at risk for adverse health, mental-health, and social outcomes. These are psychological abuse; physical abuse; sexual abuse; emotional

---

3. During Kirkland's original sentencing hearing in 2010, a different expert witness indicated that Kirkland's father left home when Kirkland was nine or ten years old. *Kirkland I*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 147.

and physical neglect; substance abuse by family members; parental absence, divorce, or separation; mental illness in a parent; a battered mother; domestic violence by a parent; and the incarceration of a family member. When these things happen between birth and 18 years, they interrupt a child's neurodevelopment. According to Dr. van Eys, only a small fraction of the population reports eight or more adverse childhood experiences. Kirkland reported nine.

{¶ 167} Dr. van Eys testified that the amygdala is the "survival part of the brain," the part that responds to perceived threats. Because the amygdala is connected to the prefrontal cortex, the "thinking part" of the brain, an incorrect threat alarm from the amygdala can be corrected. But toxic stress enlarges the amygdala while weakening its connection to the prefrontal cortex. As a result, the threat-response system can become overactive in abused children.

{¶ 168} According to Dr. van Eys, an abused child will read a facial expression as angry that a normal child would perceive as fearful. Dr. van Eys theorized that when Kirkland encountered Esme, she may have had a concerned or fearful facial expression; Kirkland may have misinterpreted her expression as threatening, or it may have reminded him of the helpless and scared expression of his mother when she was being abused. Such a misinterpretation would throw the amygdala into "survival mode," according to Dr. van Eys. Similarly, she noted, one of Kirkland's victims (presumably Rolison) allegedly produced a knife during their altercation, and another (presumably either Newton or Casonya) allegedly struck Kirkland; according to Dr. van Eys, these actions could have triggered a "survival response" from Kirkland, and after that, his acts would have been "survival actions, not thinking actions."

{¶ 169} Much of the information Dr. van Eys relied on in evaluating Kirkland's childhood came from Kirkland. Many of Kirkland's childhood memories lacked specificity, and Dr. van Eys admitted on cross-examination that this lack of specificity could raise questions about their credibility; however, she

testified that Kirkland "presented like a person who has had trauma," not like somebody making things up.

### c. Kirkland's Unsworn Statement

{¶ 170} Kirkland made a brief unsworn statement to the jury. He admitted responsibility for the deaths of the four victims and expressed remorse. He discussed his childhood abuse and his early use of drugs and alcohol "to cope with the lack of a sense of confidence and belonging." He said that he could offer no explanation for his acts, but added: "I am proof a young person deeply abused physically and emotionally and mentally becomes the abuser." He said that he did not deserve to live, but he asked the jury to spare his life.

### d. Other Factors

{¶ 171} The factors set forth in R.C. 2929.04(B)(1) and (2) and (4) through (6) are inapplicable. Youth is not a factor. The degree of the defendant's participation is a factor only when the defendant is not the principal offender; here, Kirkland was the principal offender, in fact, he was the sole offender. He does not lack a substantial criminal record. There was no evidence that the victims induced or facilitated the murder and no evidence of duress, coercion, or provocation.

{¶ 172} Other mitigating factors, R.C. 2929.04(B)(7), include Kirkland's confession and his expression of remorse. However, the nature and circumstances of the aggravated murders offer no mitigation here.

### 4. Weighing

{¶ 173} Dr. Wu testified that Kirkland was unable to conform his conduct to the law (a mitigating factor under R.C. 2929.04(B)(3)) due to his trauma-induced brain abnormalities. But serious questions exist concerning Dr. Wu's theories and diagnostic methods. It does not appear that the relevant scientific communities accept either PET scanning or voxel analysis as a valid tool for diagnosing brain injury. Drs. Waxman, Wright, and Boulter all testified that Kirkland's scans were normal. We find that Dr. Wu's opinions are entitled to no weight in mitigation.

**{¶ 174}** Dr. van Eys testified that Kirkland's childhood abuse and neglect led to PTSD and dissociative disorder, and she expressed the opinion that because of these disorders, Kirkland "was not able to conform to the norms of the law." However, we have seldom ascribed much weight in mitigation to a defendant's unstable or troubled childhood. *See*, *e.g*., *State v. Campbell*, 95 Ohio St.3d 48, 51-54, 765 N.E.2d 334 (2002); *State v. Cooey*, 46 Ohio St.3d 20, 41, 544 N.E.2d 895 (1989).

**{¶ 175}** Nor do we here. Kirkland, who was born in 1968, committed these murders when he was in his late 30s and early 40s. As we noted was true with regard to a different capital defendant, "[h]e had reached 'an age when * * * maturity could have intervened' and 'had clearly made life choices as an adult before committing [these] murder[s].' " *See Campbell* at 53 (Campbell committed aggravated murder at the age of 49), quoting *State v. Murphy*, 65 Ohio St.3d 554, 588, 605 N.E.2d 884 (1992) (Moyer, C.J., dissenting). He had "had considerable time to distance himself from his childhood and allow other factors to assert themselves in his personality and his behavior." *Id*.

**{¶ 176}** Kirkland's history of alcohol and drug abuse is entitled to some weight in mitigation. *See Kirkland I,* 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 158, citing *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 108.

**{¶ 177}** Finally, a confession is entitled to some weight in mitigation, and Kirkland did confess. But he did it haltingly and grudgingly, telling an assortment of different stories that denied or minimized his responsibility. This diminishes the mitigating value of his confession and calls into question the sincerity of his remorse. Still, "in the peculiar circumstances here, * * * Kirkland's confession is entitled to serious consideration because the information he voluntarily provided enabled the police to identify the body of Kimya Rolison, and thus her family was able to learn what had happened to her." *Kirkland I* at ¶ 159.

{¶ 178} We conclude that collectively the mitigating factors in this case deserve only modest weight. The aggravating circumstances, on the other hand, are entitled to significant weight.

{¶ 179} Course of conduct and attempted rape are especially grave aggravating circumstances, and in this case, their gravity is exacerbated by the nature and circumstances of these aggravating circumstances. As to the course-of-conduct aggravating circumstance, Kirkland's course of conduct consisted of four murders committed from 2006 to 2009. As to the attempted-rape aggravating circumstance, we note that both victims were young—Casonya was 14, Esme 13—and in attempting to rape Esme, Kirkland beat her severely. Finally, Kirkland robbed Casonya and Esme; this aggravating circumstance is entitled to some weight.

{¶ 180} Against the mitigating factors, we have weighed the aggravating circumstances the jury found with respect to Casonya's aggravated murder. Likewise, we have separately weighed the aggravating circumstances of Esme's aggravated murder against the mitigating factors. *See Cooey*, 46 Ohio St.3d at 38, 544 N.E.2d 895. In both cases, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

5. Proportionality Review

{¶ 181} In *Kirkland I*, we concluded that Kirkland's death sentences were not excessive or disproportionate to the penalty imposed in similar cases:

> In [*State v.*] *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 265, this court affirmed the defendant's death sentence for aggravated murder in the course of committing a rape. The court has also affirmed death sentences in cases combining a course-of-conduct specification with a robbery-murder specification. *See* [*State v.*] *Perez*, 124 Ohio St.3d 122,

2009-Ohio-6179, 920 N.E.2d 104, at ¶ 253, and cases cited therein. Therefore, we find that the sentence is appropriate.

*Kirkland I*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 168. That conclusion remains sound. We find that the death sentences in this case are proportionate and appropriate.

### III. CONCLUSION

**{¶ 182}** We affirm the sentences of death imposed for the murders of Casonya C. and Esme K. Accordingly, we affirm the judgment of the trial court.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs in judgment only.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, Ronald W. Springman, Chief Assistant Prosecuting Attorney, and Adam Tieger, Assistant Prosecuting Attorney, for appellee.

Timothy J. McKenna and Roger W. Kirk, for appellant.

_____