[Cite as *State v. Singleton*, 2021-Ohio-3010.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff - Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. John W. Wise, J. |
| -vs- | : | |
| | : | |
| MICHAEL SINGLETON, | : | Case No. 20 CAA 06 0026 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:  Appeal from the Delaware County
Court of Common Pleas, Case No.
19 CRI 05 0316

JUDGMENT:  Affirmed

DATE OF JUDGMENT:  August 31, 2021

APPEARANCES:

For Plaintiff-Appellee  For Defendant-Appellant

MELISSA A. SCHIFFEL  WILLIAM T. CRAMER
Delaware County Prosecutor  470 Olde Worthington Road, Suite 200
  Westerville, Ohio 43082
By: JOEL C. WALKER
Assistant Prosecuting Attorney
145 N. Union Street, 3rd Floor
Delaware, Ohio 43015

*Baldwin, J.*

{¶1}    Appellant, Michael Singleton, appeals the verdict of the Delaware County Court of Common Pleas finding him guilty of two counts of forcible rape in violation of R.C. 2907.02(A)(2), both first-degree felonies; and abduction, with a sexual motivation, in violation of R.C. 2905.02(B), a second-degree felony. Appellee is the State of Ohio.

## STATEMENT OF FACTS AND THE CASE

{¶2}    Carrie Wooten began exchanging FaceBook messages with Singleton in March 2019. Singleton claimed that he knew Wooten from high school, but she did not remember him.  They communicated through written messages in FaceBook Messenger, exchanged voice-mail messages, and used FaceTime to communicate face to face.  The messages became annoying to Wooten as they were taking up a lot of time and she found Singleton "seemed to have what [she] would call drama associated with him."  (Transcript p. 219, lines 19-25) She quit responding and deleted his messages from her phone to preserve space in its memory.

{¶3}    Singleton messaged Wooten again on April 18, 2019, about two weeks after their last contact, and they resumed their electronic conversation. Wooten began talking with him again because the tone of his messages had changed. "He started sounding like he was trying to be more stable. He was talking about getting right with God, getting right with his family and wanting to, you know, make amends with them, and get back on track with his life." (Transcript, p. 224, lines 24-25; p.25, lines 1-3).

{¶4}    Singleton claimed to live in Indiana and he expressed a desire to return to Ohio to reconnect with his family. He begged for her assistance. (Transcript, p.225).

Wooten interpreted his comments as sincere and offered to buy a bus ticket for Singleton to return to Ohio. He accepted the offer and stated he would repay her for the expense.

{¶5} Singleton's arrival time was originally scheduled for April 20, 2019 at 8:00 p.m., (Transcript, p. 464, line 9) but he missed that bus and bought a ticket that brought him to the bus station just before 2:30 a.m. Wooten met him at the bus station and drove him to her home. She asked about when he would want to meet with his mother, but he avoided that topic. She asked that he sleep on the couch, but he refused, and insisted that he sleep in her bed. (Transcript, p. 286, lines 3-10). They talked until they fell asleep. In the morning they engaged in consensual sex that Wooten described as normal and did not involve hair-pulling, biting, slapping, angry talk or any uncomfortable positions.

{¶6} .Wooten was not scheduled to work on April 21st, the day after Singleton's arrival, so they stayed together and talked. Wooten urged Singleton to go to his mother's home, but he avoided discussing the topic and did not leave.

{¶7} Over the next few days they spent little time together as Singleton had found employment and was generally at work while Wooten was home. He did continue to send messages to Wooten while she was at work and, occasionally, the messages were intimate and explicit. Singleton stated at one time that he loved Wooten, and Wooten responded by sending a heart shaped icon. She later told him that she just did not feel that way about him and began keeping him at arm's length. (Transcript, p. 327, lines 13-21; p. 329, lines 6-7.) Singleton continued to send multiple text and voice messages while Wooten was at work, often unable or unwilling to respond. On Thursday, April 25, 2019, Wooten delivered a message: "I literally just saw these and listened to them... I honestly don't know what to say... I told you I don't do drama or BS and all you do is this back and

forth bi-polar shit that I'm not wanting nor needing. I'm sure you're sorry and what not but I think it's time for you to move on... I'm sorry I really am but I'm over it for real." (Transcript, p.357, lines 11-17). Singleton did not leave and on Friday afternoon she sent him a text message:

> "I said, "I'm not playing anybody... I work and I come home and sleep and I told you that before you got here. As far as I remember I told you we had to get to know each other but I'm pretty sure you had it in your head that we were just jumping into relationship slash living together right away. I told you yesterday that I was over it and I haven't changed my mind about it. I obviously do what I say I'm gonna do cuz you're here. Like I said I forgive what's been said and I wish no ill will on you but I'm over it and yes you're gonna have to find someone else to stay with I'm sorry."

Transcript, p. 364, lines 4-14

{¶8} When she returned home from work Saturday morning, April 27, Singleton was on the couch. She did not speak to him, but went to bed and awoke around 2:00 p.m. to find her adult son, Aaron Sebach, and Singleton talking. Singleton was drinking vodka at the time. All three went out and purchased alcohol, but the parties have conflicting stories regarding whether they all went together or Wooten went by herself. Wooten remembers ordering a pizza before leaving for a local department store where she made purchases, including a bottle of wine.

{¶9} When Wooten returned, Singleton was still present, but neither spoke to the other. She described it as an awkward environment where she and Singleton were just there and not speaking to each other. The pizza had arrived and Sebach and Singleton

had started eating.  Wooten had a glass of wine with her pizza and she had a shot of hard liquor with her son and Singleton.

{¶10}  Sebach invited some of his friends over and they had planned to go out, but he was concerned about leaving his mother with Singleton.  While he could not clearly articulate the source of his concern, he was bothered by a feeling that the relationship between his mother and Singleton had worsened.  Nevertheless, he left with his friends at Wooten's urging.

{¶11}  Wooten had no desire to speak with Singleton that evening and was viewing FaceBook for relief and distraction.  Singleton asked who she was talking to, and she responded "no one."  He hit her phone and asked again who she was talking to and she responded that she was just scrolling through FaceBook and showed her phone.

{¶12}  He then came up to her right side, pulled her pants down to expose the top of her buttocks and bit her on the thigh, causing Singleton to react to the pain by turning, pushing Singleton and asking him why he did that, telling him that it hurt.  She attempted to put some space between her and Singleton by moving into the living room from the kitchen, but Singleton tackled her to the ground and pushed her legs up beside her head and slapped her face.  He grabbed her arm and forced her up the stairs, laughing at her questions and telling her he has all night to do this.

{¶13}  He dragged her to the bedroom and threw her to the bed and again forced her legs up beside her head and slapped her face.  He removed her pants, and anticipating his next step, she asked that he stop because she was still on her period. He removed her tampon, bit her thighs and vagina and digitally penetrated her vagina and anus.  He then stood to remove his pants and then forcibly penetrated her vagina with his

penis, ultimately ejaculating inside Wooten. Wooten testified that she did not consent to any of this sexual conduct.

{¶14} Singleton cleaned the blood from his genitals and re-dressed, then sat on the bed. Rocking back and forth on the bed and clapping his hands, Singleton questioned Wooten's mental state, asking if she was bi-polar telling her that he needed to "figure things out." Singleton next wrapped a t-shirt around her neck and tightened it, restraining her breathing and telling her that he should take care of her now so she could not say anything. (Transcript, p. 415, lines 14-15). He left the bedroom, telling her to stay put while he smoked a cigarette. Singleton went outside the apartment and, after he closed the door Wooten followed and locked the door, returned to the bedroom and locked that door and called her son. When she reached him, she told him that Singleton had hit her and asked that he come home. She called 911 and put the phone under her bed and then retrieved a pistol from under the bed.

{¶15} Singleton re-entered the apartment, apparently bypassing the door locks with a credit card and confronted Wooten in the bedroom. She pointed the gun at him and he laughed but did not enter the bedroom. He paced in the doorway and then went downstairs where he was confronted by Sebach. Sebach told him to leave and Singleton refused until Sebach produced a gun and ordered him from the home.

{¶16} Sebach checked on his mother and found her wrapped in a towel, wearing a tank top and still holding a pistol. Her face was red and she had some bumps and she was obviously very upset. She mentioned that she had called 911, so he expected the police to arrive soon. Wooten stayed in her room and fell asleep, vomiting on herself during the night. The police did not arrive and, in the morning, Sebach called his sisters.

They came to the apartment and took Wooten to the police department and then to the hospital for an exam by a Sexual Assault Nurse Examiner. While Wooten showed no obvious signs of injuries, she complained of pain in her neck and legs and walked with a limp.

{¶17} Detective Sergeant Michael Bolen of the Delaware Police Department spoke with both Wooten and her son multiple times, photographed Wooten's apartment and gathered relevant evidence. At his request, Wooten gave Detective Bolen her FaceBook password and he was able to retrieve text and voice messages exchanged by Wooten and Singleton.

{¶18} In May 2019, Singleton was indicted for two counts of forcible rape in violation of R.C. 2907.02(A)(2), both first-degree felonies; and one count of abduction, with a sexual motivation, in violation of R.C. 2905.02(B), a second-degree felony. And in August 2019, the State filed a Bill of Information alleging that after the indictment was filed, Singleton engaged in witness intimidation in violation of R.C. 2921.04(A), a first-degree misdemeanor. The trial court subsequently granted the state's motion to join the charges for trial.

{¶19} Singleton entered a guilty plea to the witness intimidation charge. During the plea hearing, the prosecution alleged that while he was in jail awaiting trial on the rape charge, Singleton contacted an ex-girlfriend and asked her to convince the victim not to continue with the prosecution. Singleton agreed with those facts. The trial court accepted Singleton's plea and moved on to the trial on the felonies.

{¶20} The remaining charges were tried before a jury in June 2020 and Singleton was convicted on both counts of rape and the single count of abduction. The court

merged the abduction charge with the first count of rape and sentenced Singleton to an indefinite minimum term of ten years for each rape charge to run consecutively for an aggregate sentence of twenty to twenty-five years. The ninety-day sentence for witness intimidation was to run concurrently with the sentences for the rape. Singleton was ordered to register as a Tier III sex offender.

**{¶21}** Singleton filed a notice of appeal and submitted two assignments of error:

**{¶22}** "I. THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE GUILTY VERDICTS ON EITHER COUNT OF RAPE OR THE COUNT OF ABDUCTION."

**{¶23}** "II. APPELLANT WAS DEPRIVED OF A FAIR TRIAL IN VIOLATION OF DUE PROCESS WHEN THE PROSECUTION COMMITTED MISCONDUCT BY MISSTATING THE LAW REGARDING THE MENTAL STATE FOR RAPE DURING CLOSING ARGUMENTS."

### ANALYSIS

### I.

**{¶24}** Singleton argues that the weight of the evidence does not support the guilty verdicts for rape and abduction, focusing primarily on the credibility of the state's witnesses and inconsistencies or conflicts between their stories. Singleton's counsel relied upon the same argument at trial, thoroughly cross-examining the witnesses to reveal and highlight what he described as serious defects in the state's case and grounds for a not guilty verdict. Singleton's trial counsel reviewed all the alleged defects and inconsistencies in his closing argument, but the jury was not persuaded.

**STANDARD OF REVIEW**

**{¶25}** As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins,* 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355; State v. Issa, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.
>
> * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶26}** The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy,* 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the

appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, quoting *State v. Gore,* 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

{¶27} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶28} Singleton was charged with two counts of forcible rape in violation of R.C. 2907.02(A)(2), both first-degree felonies; and one count of abduction, with a sexual motivation, in violation of R.C. 2905.02(B), a second-degree felony. Revised Code 2905.02(B) states that "[n]o person, with a sexual motivation, shall * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear."

{¶29} Wooten described how Singleton tackled her as she tried to move away from him and pushed her legs up beside her head. He took her by the arm and forced her to follow him to the bedroom where he removed her pants and began biting her and subsequently raped her. She testified that her neck and legs were injured as a result and that she was confused and fearful as a result of Singleton's aggressive behavior.

{¶30} Singleton's behavior supports the jury's conclusion that he was acting with a sexual motivation and Wooten's testimony, if believed, support a finding that he forcefully restrained Wooten, caused her physical harm and fear.

{¶31} The record also supports the jury's guilty verdict for two counts of rape. Revised Code 2907.20(A)(2) prohibits engaging in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct means vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). Wooten's description of Singleton's actions satisfies the elements of the offense of forcible rape. He gripped her arm, forced her to follow him to the bedroom where he threw her on the bed. He removed her pants, underwear and tampon and bit her in the groin and vagina and then penetrated her anally and vaginally with his fingers. He then removed his clothing and engaged in vaginal intercourse with Wooten again placing her in an awkward position with her legs pushed up near her head. She did not consent to any of this conduct and told him she did not want him to do this, but he only responded that she liked it and he would not stop.

**{¶32}** Wooten and Singleton engaged in sexual intercourse in the morning after his arrival, but Singleton did not bite Wooten, did not tackle her, drag her to the bedroom or push her legs up near her head. Wooten confirmed that she had consented to that interaction, but did not consent to the aggressive behavior that gave rise to the charges of rape. The testimony of Wooten, if believed, supports a conviction for a charge of rape in violation of R.C. 2907.02(A)(2).

**{¶33}** Singleton suggests that the jury lost its way in arriving at a guilty verdict based upon inconsistencies, lack of evidence of injuries to Wooten, or unexplained facts. We have reviewed the record and transcript closely and, though Singleton points out several issues, some significant, such as the lack of any visible evidence of injury to Wooten, and others minor, such as the likelihood that Wooten's phone landed on top of an animal cage, we cannot conclude that the jury lost its way in arriving at a guilty verdict. The state provided evidence that, if believed, supported a guilty verdict.

**{¶34}** Singleton argued that Wooten was drunk during the incident and not a credible witness, but the jury exercised its discretion, accepted her version of the facts and was not swayed by Singleton's argument. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) quoting State *v. Nivens,* 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true.

*State v. Raver,* 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke,* 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, quoting *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks,* 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, superseded by State constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

**{¶35}** When we consider the evidence presented at trial regarding the rape as well as the efforts of Singleton to persuade Wooten to not testify, we conclude that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins, supra.* The jury neither lost its way nor created a miscarriage of justice in convicting Appellant and Appellee presented evidence of his guilt beyond a reasonable doubt.

**{¶36}**    Singleton's first assignment of error is denied.

**II.**

**{¶37}** In his second assignment of error, Singleton complaints that he was deprived of a fair trial in violation of due process when the prosecution committed misconduct by misstating the law regarding the mental state for rape during closing arguments.  He cites to a lengthy passage from the trial and notes that trial counsel objected, suggesting that the objection applies to all the preceding comments of the prosecutor.  Upon review of the transcript, we find the subject of the objection to be the two sentences preceding the objection:

If you were to believe defense counsel that this is just about Michael's perception, then the State submits to you that the overwhelming evidence in this case combined with the testimony should demonstrate to you that is an offensive statement. That if someone says I didn't think I raped her, then that person could not be found guilty.

(Transcript, p. 893, lines 6-12).

**{¶38}** Trial counsel did object, and did not comment on the law, but only stated "[n]ot the case," so the nature of this objection is not clear.

**{¶39}** The Supreme Court of Ohio has instructed that:

When reviewing a claim of prosecutorial misconduct, our inquiry is twofold: we must first decide whether the prosecutor's actions were improper, and if so, we consider whether the conduct prejudicially affected the defendant's substantial rights. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 228. "The touchstone of due process analysis * * * is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Thus, "[t]he relevant question is whether the prosecutor's 'comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); see generally *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 78.

*State v. Kirkland,* 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716 *reconsideration denied,* 160 Ohio St.3d 1421, 2020-Ohio-4811, 154 N.E.3d 109, and *cert. denied,* 2021 WL 1951932, 209 L.Ed.2d 763.

**{¶40}** Singleton insists that the comment of the prosecutor is a misstatement of law and that "[a]lthough objective evidence may often be useful in discerning a defendant's subjective state of mind, a jury can acquit a defendant-of rape based solely on the defendant's subjective perception that sex was consensual, provided the jurors believe the defendant on that point. Thus, the prosecution's closing argument misstated the law on rape." (Appellant's Brief, p. 24). Appellant's conclusion, that he may be acquitted based upon his subjective perception that the sex was consensual relies upon selected citations to *State v. Hartman*, 2nd Dist. Montgomery No. 26609, 2016-0hio-2883, 64 N.E.3d 519.

**{¶41}** The court in *Hartman* discussed the victim's subjective beliefs, but never uses the term "subjective" to describe Hartman's mental state. When referring to the elements of purpose or intent, the court refers to an excerpt from the decision in *State v. Mundy*, 99 Ohio App.3d 275, 288, 650 N.E.2d 502 (2d Dist.1994):

> The determination of a defendant's mental state, absent some comment on his or her part, must of necessity be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. This is, in fact, the well-recognized process of inferential reasoning. This process by necessity incorporates an objective mechanism or standard in determining the defendant's state of mind by the use of

circumstantial evidence. The trier of fact reviews the defendant's conduct in light of the surrounding facts and circumstances and infers a purpose or motive.

**{¶42}** We find no support in *Hartman* for Singleton's conclusion that he may be acquitted based upon his subjective perception that the sex was consensual, and his argument reveals that he does not rely on that mischaracterization of the law.  First, he notes that the jurors must believe him and then he describes the parties conduct in light of the surrounding facts and circumstances to support his contention that Wooten's contention that the rape was not consensual should not be believed. Singleton is relying on the surrounding facts and circumstances to bolster his argument that the sexual conduct was consensual and, in fact, offers no evidence regarding his subjective perception.

**{¶43}** The prosecutor stated that Singleton may argue that he perceived that his sexual conduct was not rape, but he may still be convicted of rape based upon the conduct of the parties and the surrounding facts and circumstances. In the context of this case, we do not find that the prosecutor's comments were legally incorrect, that his actions were improper or that Singleton's substantial rights were prejudicially affected by the comment.  That comment did not so infect the trial with unfairness as to make the resulting conviction a denial of due process as the state's obligation to prove all the elements of the crime were clearly stated.  The trial court's instructions provided a definition of the element of purpose and its response to the jury's question regarding consent served to emphasize the obligation of the state to prove intent and purpose. Further, there was no direct evidence of Singleton's subjective perception of his sexual

conduct, so the jury and the parties relied upon circumstantial evidence to evaluate his intent and purpose.

{¶44}  Singleton's second assignment of error is overruled and the decision of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, P.J.

Hoffman, J. and

Wise, John, J. concur.