[Cite as *In re E.S.*, 2022-Ohio-2003.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN RE: E.S. | : | JUDGES: |
| | : | |
| | : | Hon. Earle E. Wise, Jr., P.J. |
| | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| | : | |
| | : | Case No. 21CAF080041 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Delaware County Court of Common Pleas, Juvenile Division, Case No. 20060942DL |
| JUDGMENT: | AFFIRMED |
| DATE OF JUDGMENT ENTRY: | June 13, 2022 |

APPEARANCES:

For Plaintiff-Appellee:

MELISSA A. SCHIFFEL
DELAWARE CO. PROSECUTOR
ELIZABETH MATUNE
145 North Union St., 3rd Floor
Delaware, OH 43015

For Defendant-Appellant:

WILLIAM T. CRAMER
470 Olde Worthington Road, Ste. 200
Westerville, OH 43082

*Delaney, J.*

{¶1} Appellant E.S., a juvenile, appeals from the July 12, 2021 Judgment Entry-Trial of the Delaware County Court of Common Pleas, Juvenile Division. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} The following facts are adduced from the record of appellant's bench trial before the juvenile court.

### *Testimony of Jane Doe*

{¶3} This case arose on March 2, 2020, when Jane Doe went to appellant's home to watch movies; both were age 17 at the time. Two sexual encounters ensued: the first was consensual, and the second began consensually but became forcible after Doe asked appellant to stop.

{¶4} Appellant and Doe were acquaintances but not romantically involved. On this date, they connected over Snapchat and appellant asked Doe if she wanted to come to his house to watch movies. She agreed.

{¶5} Appellant lives with his grandparents. Doe arrived at the residence and appellant and his grandparents were present. Doe and appellant went to a room described as an office containing a futon and a television. The door was closed; the two turned on the television and laid down on the futon.

{¶6} According to Doe, appellant "started getting touchy" and asked if she wanted to have sex; she said yes. The two engaged in sexual intercourse. Eventually they stopped and left the room because appellant's Grandmother was preparing dinner. Grandmother asked Doe to stay for dinner and Doe acquiesced.

{¶7} After dinner, appellant and Doe returned to the office, started another movie, and began a second sexual encounter. Doe testified that she initially consented to sexual intercourse for the second time.

{¶8} Doe testified in detail about the progress of the second encounter. She was on her back with appellant on top of her; he flipped her onto her stomach and "things escalated." Intercourse became painful and she told appellant to "stop" several times. Doe clarified that she said "stop" loudly and clearly. Appellant did not stop. Doe testified she turned over partway and put her hand up, on appellant, to signal him to stop, but he put her arm down, "pinned" her wrist to the futon, and increased the pace of his sexual activity. Appellant eventually finished by ejaculating on Doe's thigh.

{¶9} Doe testified she was exhausted as this occurred and "her body gave out." She kept telling appellant to stop but he "went harder and harder and harder and faster until he was done." T. 29. She estimated she told him to stop more than ten times. The television was on, but the volume was not loud and had not impeded their conversation at any other point.

{¶10} Doe testified she was in a "clouded state of mind" and did not fully understand what happened. She dressed and left, speaking to both of appellant's grandparents on her way out. Appellant walked her to her car. She messaged appellant on Snapchat later that day and said he held her arm down; he responded, "I know." She did not talk to appellant again and unfriended him on Snapchat.

{¶11} Doe weighed the incident in her mind and cried most of the night. The next day, she was still upset and told friends at school what happened. A teacher contacted

Doe's parents, who picked her up from school and took her to a hospital for a SANE examination.

{¶12} Detectives questioned Doe and collected her belongings, including clothing from the night before and her cell phone.

*Investigation by the Dublin Police Department*

{¶13} While in possession of Doe's cell phone, a text message from appellant was received by detectives. Detective Williams of the Dublin Police Department obtained permission from Doe's mother to correspond on the phone via text as though he was Doe, and the following text conversation was later extracted from Doe's phone. The texts from Doe's phone are sent by Williams without appellant's knowledge.

| Texts from appellant's phone | Texts from Jane Doe's phone |
|---|---|
| Can I talk to you please | |
| | Why?? |
| Please | |
| Because I want to talk about it | |
| You clearly aren't OK with it | |
| | You think?  Why did you do it? |
| I told you | |
| Call me please | |
| | I told you no |
| Didn't hear | |
| | Stop |
| Ok | |
| | U kno that's bs |
| | I trusted you |
| And you still can | |
| I said I'm sorry | |
| I said I didn't mean to | |
| I'm telling you all this not because I want you to come back but because I mean it | |
| | You held me down |
| Your arm | |
| | Do you know how much this hurts me |
| Look I can't say or do anything to make you feel better or to change anything but I like you.  I think you're amazing.  I didn't | |

| | |
|---|---|
| mean to hurt you and I would literally never do it again. And you have my word. | |
| No I don't. | |
| But I wish I did | |
| | You know you heard me say stop |
| | How can I forgive you when |
| | Ur not even truthful |
| | How can I believe you |
| I am being truthful | |
| [Jane] | |
| I like you | |
| I didn't mean to hurt you | |
| I don't want to do it again | |
| I'm sorry | |
| | What are you sorry? |
| Yes I'm sorry | |
| | Do u even call that sex now |
| No | |
| It means nothing but horrible things to me | |
| I don't ever want to hurt you again [Jane] | |
| | Did you know that was going to happen when u asked to have sex? |
| No | |
| It was supposed to be just like the first time | |
| But I fucked up | |
| | The first time what? |
| We had sex | |
| | So u admit u fucked up |
| Yes I did that yesterday | |
| I fucked up | |
| And I'm sorry | |
| | You heard me say stop |
| I didn't | |
| I swear to you I didn't | |
| | I know ur not deaf |
| You're right | |
| But I didn't hear you | |

{¶14} During the ensuing investigation, Williams examined Doe's phone and found an earlier exchange with appellant in which he asked Doe, "Hey, are you okay?"

and she responded, "Yeah. Why?" Appellant replied, "Just wanted to make sure." Doe's cell phone activity indicated that upon returning home from appellant's residence, Doe made several searches in the Safari browser for "define rape" and "definition of rape."

{¶15} After the cell phone text exchange, Williams interviewed appellant at his home with Grandmother present. Appellant initially denied sexual contact with Doe, telling Williams, "We thought about it, we talked about it, but we didn't." Williams asked appellant if he was sure, and appellant responded "I'm positive."

{¶16} Appellant then asked to speak to Williams alone, and after Grandmother was out of the room, admitted he and Doe had sex twice. He said Doe consented both times and he did not hear her say "Stop." He told Williams, "I told her that I can't stop doing something you don't like if I don't hear you say that," and "I have no memory of her telling me to stop." When asked about their positions during the second sexual encounter, appellant said, "She put her hand on my hip. I took her hand off my hip because it made me feel uncomfortable." Further, "I asked her. She didn't say anything." Appellant denied pinning Doe's arm down. Appellant commented to Williams that this would be a "he-said, she-said case."

*SANE interview and school witness*

{¶17} Appellee called Dr. Gail Horner, a pediatric nurse practitioner at Children's Advocacy Center and the Director of Nursing Practice at Children's Hospital, who has completed more than 3000 physical exams. With Doe, Horner conducted a physical exam and forensic interview; she also tested Doe for sexually-transmitted diseases. Doe told Horner the second sexual encounter with appellant was painful and that she told him to stop several times. During the interview, Doe said the painful sexual intercourse

occurred while she was laying on her side. Horner testified that the absence of physical injury is neither surprising nor dispositive of whether Doe was raped.

{¶18} Appellee called A.M., a school counselor at Doe's school. A.M. was called to a lab in early March 2020 because Doe was under a desk, crying. When A.M. made contact, Doe was no longer crying but began crying during their conversation. Doe explained she was at a friend's house and they were making out; they started having sex and she asked her friend to stop, but he did not stop. Doe asked A.M. if that was bad. A.M. explained the friend should have stopped if she changed her mind about sex.

{¶19} A.M. explained to Doe that she was required to report their conversation. Consequently, law enforcement began an investigation and Doe's parents took her for the SANE exam. A.M. also contacted Child Protective Services.

*Defense case*

{¶20} Grandmother testified as a defense witness. The incident occurred at her house. She said she came into the room at least three times while appellant and Doe were present to do laundry. She said the door was closed but not fully shut. At first, appellant and Doe were sitting up; another time they were "kind of leaning." Grandmother did not hear or observe any signs of sexual activity. Doe left between 7:15 and 7:30 p.m., she thanked Grandmother and complimented the dinner, and did not seem upset. Grandmother was "shocked" sexual activity took place and did not hear or observe any signs of a disturbance.

{¶21} Appellant testified on his own behalf. He was 17 at the time of the offense and knew Doe because they dated each other's friends in the past. In early March 2020, he communicated with Doe via Snapchat because he saw she was upset. He invited her

to his residence to watch a movie. The two sat on a futon, which was pulled flat. Appellant's Grandmother came into the room several times before the pair began having sex.

{¶22} Appellant asked Doe if she wanted to have sex and she said yes. Doe removed her clothing. Both were on their sides, facing the wall. Appellant testified that at one point, Doe said "hold on" because she was out of breath and he stopped. The two smelled dinner cooking and decided to stop to eat dinner.

{¶23} After dinner, they began to watch a second movie, and appellant asked Doe if she wanted to have sex again. She said yes and again removed her own clothing.

{¶24} Appellant testified that Doe did not claim to be in any pain. During the second encounter, she placed her hand between his hip and thigh but didn't say anything. Appellant admitted he grabbed her hand, but only because the placement of her hand made him uncomfortable.

{¶25} Appellant further testified that he asked Doe if she wanted to stop, but she didn't say anything. Appellant continued with sexual intercourse and ejaculated on Doe's thigh. They watched another ten or fifteen minutes of the movie, then Doe got up to leave. Appellant testified that he asked her if she "liked it" and she said "yeah." As she left, she said "We should do this again." Appellant testified they had no problems hearing each other and the movie volume was not overly loud.

{¶26} Appellant testified he lied to Williams in front of Grandmother only because he was concerned about probation for a prior offense.

{¶27} Appellant was charged with one count of delinquency by means of rape pursuant to R.C. 2152.02 and 2907.02(A)(2), a felony of the first degree. Appellant was

adjudicated delinquent by means of rape following a bench trial and the trial court issued a judgment entry containing findings of fact and conclusions of law on July 12, 2021. On August 18, 2021, the trial court issued a judgment entry of disposition ordering a term of community control including suspended commitments to DYS and the Central Ohio Youth Center, and residential inpatient treatment at the Butler County Juvenile Rehabilitation Center.

{¶28} Appellant now appeals from the judgment entries of his conviction and sentence.

{¶29} Appellant raises one assignment of error:

### ASSIGNMENT OF ERROR

{¶30} "APPELLANT'S ADJUDICATION OF DELINQUENCY BASED ON A FINDING OF RAPE WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE."

### ANALYSIS

{¶31} Appellant argues his rape conviction is against the manifest weight of the evidence because Doe did not effectively communicate her withdrawal of consent to sexual intercourse. We disagree.

{¶32} Juvenile delinquency proceedings are civil, not criminal, but due process protections still apply. *In re Kara C.*, 5th Dist. Fairfield No. 09-CA-27, 2010-Ohio-306, ¶ 10, citing *In Re: Gault*, 37 U.S. 1, 87 S.Ct. 148 (1967); *In Re: Anderson*, 92 Ohio St.3d 63 748 N.E.2d 67 (2001).

{¶33} Appellant argues his rape conviction is not supported by the weight of the evidence. An appellate court applies the same manifest weight standard of review in a juvenile delinquency case that it applies in an adult criminal appeal. *Matter of T.S.*, 5th

Dist. Delaware No. 21 CAF 08 0039, 2022-Ohio-975, ¶ 26, citing *In re E.A.*, 9th Dist. Summit No. 28106, 2016-Ohio-7281, ¶ 11. When reviewing a weight-of-the-evidence argument, the appellate court reviews the entire record, weighing the evidence and all reasonable inferences; considers the credibility of witnesses; and determines whether in resolving conflicts of evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶34} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 189, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶35} Appellant was found delinquent by means of rape pursuant to R.C. 2907.02(A)(2), which states, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature. *State v. Schmelmer*, 5th Dist. Delaware No. 2020 CAA 11 0049, 2022-Ohio-57, ¶ 72, citing R.C. 2901.22(A).

{¶36} It is undisputed that the parties engaged in sexual intercourse, some of which was consensual. Doe testified the intercourse became forced after she repeatedly asked appellant to stop. In *Schmelmer*, supra, 2022-Ohio-57, at ¶ 73-75, we reviewed the definition of "force" in the context of sexual assault:

> In addressing the force-or-threat-of-force language under the rape and statute, the Supreme Court of Ohio clarified that "[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus.

> "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). A victim "need not prove physical resistance to the offender" in order to demonstrate force. R.C. 2907.05(D).

> "'[T]he amount of force [necessary to prove forcible rape under R.C. 2907.02(A)(2)] must be examined in light of the circumstances.'" * * * *State v. Runyons*, 3d Dist. Union No. 14–91–30, 1992 WL 136196 (June 9, 1992). "The Supreme Court of Ohio 'case law demonstrates that the type and amount of force necessary to purposefully compel a victim to submit by "force or threat of force" depends upon the victim and the offender's relationship.' " *Id.*, quoting *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-

2837, 2012 WL 2371396, ¶ 41, citing *State v. Pordash*, 9th Dist.

Lorain No. 04CA008480, 2004-Ohio-6081, 2004 WL 2600461, ¶ 12.

The amount of force necessary "depends upon the age, size and

strength of the parties and their relation to each other." *In re Forbess*,

3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826, 2010 WL 2488064,

¶ 40, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304

(1988), paragraph one of the syllabus.

{¶37} In the instant case, Doe testified appellant continued and intensified the sexual conduct despite her protestations to stop. She placed her hand on his hip to signal him to stop and he moved her arm, pinning her wrist to the futon.

{¶38} The trial court probed whether Doe's withdrawal of consent affected an analysis of whether appellant compelled Doe to submit by force or threat of force. As appellant acknowledges, rape may occur when a victim has first consented to sexual activity, and then withdraws that consent. In the instant case, the trial court developed an analysis of withdrawn-consent rape as follows:

> * * * *.
>
> First, the withdrawal of consent must be conveyed in such a
>
> manner that a reasonable person would understand that consent had
>
> been withdrawn. Second, the other person must have a brief time to
>
> comprehend the withdrawal of consent and cease the act. Third, the
>
> other participant must then continue the act through force or
>
> compulsion.
>
> * * * *.

Judgment Entry Trial, July 12, 2021, ¶ 24, citations omitted.

{¶39} We do not need to adopt any evaluative test in the instant case to determine whether appellee established that Doe withdrew consent. When the sexual activity was no longer consensual and became a forcible act, appellant committed rape. See, *State v. Hartman*, 2nd Dist. Montgomery No. 26609, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 32, appeal not allowed, 146 Ohio St.3d 1515, 2016-Ohio-7199, 60 N.E.3d 7 ["We agree that the elements of Rape can be established when the two participants start the sexual encounter on a consensual basis, but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent."]

{¶40} Our analysis is compatible with that of the trial court, which ultimately dispensed with parsing the withdrawn-consent analysis because the matter turned upon the credibility of the witnesses. The trial court found the ultimate issue to be whether Jane Doe's testimony that she communicated "non-consent" to appellant is more or less credible than appellant's testimony that he didn't hear her. Entry, ¶ 29-30. Ultimately the trial court concluded Doe's testimony was more credible, including her testimony that appellant pinned her down while continuing sexual activity despite her withdrawal of consent. Entry, ¶ 31.

{¶41} Appellant acknowledges the Ohio rape statute [R.C. 2907.02] covers withdrawn-consent situations or "post-penetration" rape. Brief, 11. He argues, though,

that "the legal issue is whether [appellant] specifically intended to compel sexual conduct through force," and "the factual issue is whether [appellant] understood that [Doe] had withdrawn consent at some point, but forced [Doe] to continue with sexual conduct anyhow." Brief, 15. We note Doe testified that after the second encounter began, she told appellant to stop and said "no" repeatedly; she also attempted to stop him by raising her hand to his hip. Nevertheless, she testified, he continued sexual activity at a fast pace and pinned her wrist to the futon. Doe's testimony, if believed, supports a conviction for a charge of rape in violation of R.C. 2907.02(A)(2). *State v. Singleton*, 5th Dist. Delaware No. 20 CAA 06 0026, 2021-Ohio-3010, ¶ 32, appeal dismissed, 165 Ohio St.3d 1508, 2022-Ohio-140, 179 N.E.3d 1267.

{¶42} Appellant testified he didn't hear Doe ask him to stop and that he moved her hand because the placement made him uncomfortable. The trial court repeatedly noted in the Entry that Doe was more credible than appellant. See, Entry, ¶ 8-9, fn 6. The trier of fact may believe some, all, or none of the testimony of each witness, and the verdict will not be reversed simply because the trier of fact chose to believe some witnesses over others. *Matter of T.S.*, supra, 2022-Ohio-975, at ¶ 39, internal citations omitted. The trial court found portions of appellant's trial testimony "surprising" and "unbelievable." *Id.* The trier of fact is free to reject the accused's self-serving testimony. *Id.*, citing *State v. Johnson*, 9th Dist. Lorain No. 13CA010496, 2015-Ohio-1689, ¶ 15.

{¶43} Further, we note the content of appellant's text messages and his statements to Williams support an inference of appellant's knowledge that he forced Doe to continue sexual activity. See, *Matter of C.Q.*, 5th Dist. Licking No. 2020 CA 00012, 2020-Ohio-5531, ¶ 36.

{¶44} Notwithstanding appellant's arguments, based on the specific facts and circumstances  of this case, we conclude the trial court's conclusion that appellant purposefully compelled Doe to submit to sexual conduct by force or threat of force is supported by the weight of the evidence. We are mindful, moreover, that "[c]orroboration of victim testimony in rape cases is not required." *State v. Meeks*, 5th Dist. Stark No. 2014CA00017, 2015-Ohio-1527, 34 N.E.3d 382, ¶ 81, appeal not allowed, 143 Ohio St.3d 1543, 2015-Ohio-4633, 40 N.E.3d 1180, citing *State v. Cuthbert,* 5th Dist. Delaware No. 11CAA070065, 2012-Ohio-4472, 2012 WL 4474720, ¶ 28 and *State v. Johnson,* 112 Ohio St.3d 210–217, 2006-Ohio-6404, 858 N.E.2d 1144, at ¶ 53.

{¶45} Upon review, we decline to second-guess the credibility determinations the trier of fact made following the bench trial in this matter.  See, *Schmelmer*, supra.  This is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.

{¶46} The trial court neither lost its way nor created a miscarriage of justice in convicting appellant of rape, and appellee presented evidence of his guilt beyond a reasonable doubt.

**CONCLUSION**

{¶47} Appellant's sole assignment of error is overruled and the judgment of the

Delaware County Court of Common Pleas, Juvenile Division is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Wise, John, J., concur.